[No. A101491. First Dist., Div. Four. Nov. 21, 2003.]

LOUIS J. HOFFMAN, Plaintiff and Appellant, v.
THE STATE BAR OF CALIFORNIA et al., Defendants and Respondents.

COUNSEL

Stephen R. Barnett, Ephraim Margolin and Arthur Brunwasser for Plaintiff and Appellant.

Kerr & Wagstaffe, James M. Wagstaffe, Pamela Urueta; Marie Moffat, Lawrence Yee and Heather A. Irwin for Defendants and Respondents.

OPINION

**REARDON, J.**—Appellant Louis J. Hoffman, a resident of Arizona and member of the Arizona State Bar, practices law at his law firm in Scottsdale, Arizona. A patent law specialist, he does some election law work on a pro bono basis as well. Hoffman is also an active member of respondent State Bar of California (State Bar) and has practiced law in California on occasion. He wants to vote, and run, for respondent State Bar Board of Governors (Board), but he cannot. California law dictates that only active members of the State Bar who maintain their principal law offices in the respective State Bar districts can vote, or run as candidates, for the Board. (Bus. & Prof. Code,[1] §§ 6015, 6018.) There is no out-of-state district in California. (§ 6012.5.)

Hoffman has challenged these statutes under the equal protection and free speech clauses of the United States and California Constitutions, in federal and then state court. He lost both times. On appeal, Hoffman argues that we must strictly scrutinize the statutes against his charges of equal protection infirmity. We reject this claim and, testing instead for a rational basis, determine that the statutes survive constitutional inspection. Hoffman also advances free speech interests that he insists must be separately evaluated under the balancing test pertinent to ballot access cases. We are not convinced that this is the appropriate approach. Nonetheless, as applied, the test does not reveal a constitutional flaw. Accordingly, we affirm the order denying his petition for writ of mandate.

---

[1] All undesignated statutory references are to this code.

Section 6015 reads: "No person is eligible for attorney membership on the board unless he or she is an active member of the State Bar and unless he or she maintains his or her principal office for the practice of law within the State Bar district from which he or she is elected."

Section 6018 reads in relevant part: "Only active members of the State Bar maintaining their principal offices for the practice of the law in the respective State Bar districts shall be entitled to vote for the member or members of the board therefrom."

# I. BACKGROUND

## A. *The State Bar*

### 1. *Nature and Function*

The State Bar is a public corporation originally designated by statute (§ 6000 et seq.), but later attaining constitutional status by placement within the judicial article of the California Constitution (art. VI, § 9). It serves as an administrative arm of the California Supreme Court for purposes of assisting in matters of admission and discipline of attorneys (*In re Attorney Discipline System* (1998) 19 Cal.4th 582, 599–600 [79 Cal.Rptr.2d 836, 967 P.2d 49]), and is empowered generally to promote "the improvement of the administration of justice" (§ 6031, subd. (a)).

Ours is an "integrated" bar—a compulsory association of attorneys that conditions the practice of law in a particular state on membership and mandatory payment of dues. (*Keller v. State Bar of California* (1990) 496 U.S. 1, 5 [110 L.Ed.2d 1, 110 S.Ct. 2228] (*Keller II*).)[2] It performs various functions such as " 'examining applicants for admission, formulating rules of professional conduct, disciplining members for misconduct, preventing unlawful practice of the law, and engaging in study and recommendation of changes in procedural law and improvement of the administration of justice.' " (*Keller II*, at p. 5.)

Although the State Bar has been described as having a large measure of self-government (*Keller I, supra*, 47 Cal.3d at p. 1159), in keeping with the constitutional separation of powers doctrine, the California Supreme Court retains inherent and primary regulatory power over the admission, suspension and disbarment of attorneys (*In re Attorney Discipline System, supra*, 19 Cal.4th at pp. 592–593). Thus the bar's examining committee is authorized to

---

[2] This case involved a challenge to the use of mandatory bar dues to fund ideological and political activities. The California Supreme Court concluded that the State Bar was "best described as analogous to a governmental agency" (*Keller v. State Bar* (1989) 47 Cal.3d 1152, 1167 [255 Cal.Rptr. 542, 767 P.2d 1020] (*Keller I*)) and, considered as such, its dues were unrestricted revenue which could be used for any purpose within its authority, including the financing of lobbying, amicus curiae briefs and the annual delegates conference (*id.* at p. 1173). Acknowledging that the California Supreme Court was "the final authority on the 'governmental' status of the State Bar of California for purposes of state law" (*Keller II, supra*, 496 U.S. at p. 11), the United States Supreme Court concluded that for First Amendment purposes the State Bar was not a typical government agency. Finding a substantial analogy between the relationship of the bar to its members and that of unions and their members, it held that the bar was subject to the same First Amendment constraints as unions with respect to use of dues to support political and ideological causes. (*Keller II*, at pp. 11–13, 17 [reversing *Keller I* judgment].)

examine applicants for admission to practice law in California, administer the bar exam and other requirements for admission and certify to the Supreme Court those applicants who fulfill the statutory requirements, but it is the Supreme Court that grants or denies admission to the bar. (§§ 6046, 6060, 6062, 6064.) Similarly, while the Board, through the State Bar Court, conducts disciplinary hearings and makes disciplinary and disbarment recommendations to the Supreme Court, the high court can control any disciplinary proceeding at any step and has the ultimate authority to determine whether to discipline or disbar a member as recommended. (§§ 6086.5, 6079.1, 6086.65; Cal. Rules of Court, rules 953–954; *In re Rose* (2000) 22 Cal.4th 430, 438–441 [93 Cal.Rptr.2d 298, 993 P.2d 956].) So, too, the State Bar's authority to formulate rules of professional conduct is subject to Supreme Court approval. (§ 6076.) As summed up in *Keller II*, the State Bar performs important services in connection with governance of the legal profession, "but those services are essentially advisory in nature." (*Keller II, supra*, 496 U.S. at p. 11.)

There are other very specific duties and responsibilities. For example, the State Bar has constitutional responsibility, along with the Chief Justice of the Supreme Court and the houses of the Legislature, to appoint a specified number of members to the Judicial Council. (Cal. Const., art. VI, § 6.) Through the appropriate committee, the association is also required by statute to evaluate potential appointees for judicial office and report its recommendation to the Governor. (Gov. Code, § 12011.5, subds. (a), (c).) No candidate may be appointed until the State Bar has so reported, or the time for reporting has elapsed. (*Id.*, § 12011.5, subd. (k).)

Pursuant to a rule adopted by the Supreme Court (Cal. Rules of Court, rule 958), upon request by the bar as directed by the Legislature (§ 6070, subd. (a)), the State Bar has established and administers a mandatory continuing legal education (MCLE) program under rules and regulations it has adopted (*ibid.*; Cal. Rules of Court, rule 958; State Bar Min. Continuing Legal Ed. Rules & Regs., §§ 1.0–17.0; *Warden v. State Bar* (1999) 21 Cal.4th 628, 634–636 [88 Cal.Rptr.2d 283, 982 P.2d 154]). Nonetheless, certain minimum parameters of the MCLE program, and exemptions for certain attorneys from its requirements, are set forth in the statute and rule. The bar also has been given responsibility to (1) establish a system and procedure for arbitration of attorney fees, within statutory constraints (§ 6200, subd. (a)); (2) adopt regulations and procedures to implement an "interest on lawyer trust account" program to fund legal services to indigent persons (§ 6225), with the manner of distribution thereof established by statute (§ 6216); and (3) establish and administer an attorney diversion program for attorneys impaired by substance abuse or mental illness as spelled out by statute (§ 6230 et seq.).

With respect to revenue, the State Bar may fix and collect only those membership fees as are authorized by the Legislature and/or the Supreme Court, and subject to the appropriate oversight for their expenditure. (*Carpenter v. The State Bar* (1931) 211 Cal. 358, 360 [295 P. 23] [assessment of fees is regulatory measure fixed by Legislature]; see *In re Attorney Discipline System, supra,* 19 Cal.4th at pp. 619–620 [where Legislature fails to act, Supreme Court has power to impose special regulatory fee to fund disciplinary system]; see also §§ 6140, 6140.1, 6140.3, 6140.6, 6140.9, 6145.)

### 2. *Structure*

The Board is the governing body of the State Bar. (§ 6010.) It is comprised of 22 members plus the State Bar president. (§ 6011.)

Fifteen members are elected from State Bar districts, which are adjusted every 10 years. (§§ 6013.1, subd. (a), 6012.5.) One member is appointed by the California Young Lawyers Association (§ 6013.1, subd. (b)) and six public, nonlawyer members are appointed by the Governor and the Legislature (§ 6013.5).

Created in 1927, the Board originally had 15 members, 11 elected from congressional districts and four at-large members. (State Bar Act, Stats. 1927, ch. 34, § 9, p. 39.) Four years later the congressional districts had increased from 11 to 20. The State Bar appointed a reapportionment committee that recommended organizing the bar along county lines and eliminating the at-large members. Reporting to the State Bar membership, the committee chair explained: "[W]e are not providing for any election in the State at large, but for electing of members of the Board by the members of the bar of the counties and of the districts who are acquainted with the candidates and without any State-wide election or elections in which the members of the bar who are non-residents of the State participate." (Proceedings of the Fifth Annual Meeting of the State Bar of Cal. (1932) Rep. of Reapportionment Com., p. 73.)

Heeding these recommendations, the Legislature enacted the State Bar Reapportionment Act of 1933, pursuant to which districts of consolidated California counties were formed and at-large seats were eliminated. (Stats. 1933, ch. 430, § 1, pp. 1087–1088.) The limitations restricting voting and candidacy to active members who maintain their principal offices in the respective state districts have been in place for 70 years. (*Ibid.*; §§ 6015, 6018.)

Numerous other states with integrated bars, including Arizona, impose similar place of business or residency limitations restricting eligibility to vote

and/or run for the governing board.[3] Several states have created out-of-state districts, allotting seats on the governing board to members representing those districts,[4] or have at-large districts in which out-of-state members may vote.[5]

### 3. *Membership*

According to State Bar records as of December 31, 2001, the total active membership was 140,685, with 130,893 active members maintaining their offices in existing State Bar districts and 9,792 active members, or just under 7 percent, listed as having their principal offices "[o]utside California."

## B. *The Litigation*

Hoffman first challenged the district election voting and candidacy scheme in federal court, seeking a preliminary injunction mandating that the State Bar permit him to vote in the spring 2002 election. (*Hoffman v. State Bar of California* (U.S.Dist.Ct., N.D.Cal. (Apr. 9, 2002) No. C020999 SBA.) Denying relief under the United States Constitution, the district court ruled that "§§ 6015 and 6018 do not transgress the Privileges and Immunities Clause, the Equal Protection Clause, or the First Amendment."

Hoffman refiled his state constitutional claims in state court by way of petition for writ of mandate praying that the court direct the State Bar to cease enforcing sections 6015 and 6018 and "adopt and implement reasonable procedures" offering him the opportunity to vote in, and be a candidate for, the 2003 Board election. This time he abandoned his free speech claim, but pursued claims based on the privileges and immunities and equal protection clauses of the California Constitution. In an accompanying declaration, Hoffman recited his professional bona fides and concerns about the voting and candidacy scheme. Additionally, he indicated that in April 2001 he wrote to the California Bar Journal complaining that denying him the vote amounted to "taxation without representation." Further, Hoffman declared

---

[3] See, for example, Alabama (Ala. Code, § 34-3-40(a)); Arizona (Ariz. Supreme Ct. Rule 32(e)); Hawaii (Hawaii Supreme Ct. Rule 17(e)); Idaho (Idaho Code, § 3-402); Kentucky (Ky. State Bar Bylaws, § 4(b)); Michigan (Mich. State Bar Rule 5, § 4); Missouri (Mo. State Bar Rule 7.03); Nevada (Nev. Supreme Ct. Rules, pt. III; Nev. State Bar Rule 82); Oregon (Or. Rev. Stats. Ann. § 9.025 (1), (3)); Texas (Tex. Gov. Code, § 81.020); Utah (Utah Rules of Court, ch. 16, pt. III, E & F); Washington (Wash. Code Ann. ch. 2.48.030); West Virginia (West Va. Code Ann. art. IV, §§ 5, 7).

[4] See Florida (Fla. State Bar Rule 1-4.1); Georgia (Ga. State Bar Rule 1-302(a)(3)). The Oregon Bar Association has a House of Delegates which serves as the representative assembly of the membership. One region from which delegates are elected is composed of out-of-state members. (Or. Rev. Stats. Ann. § 9.136(5).)

[5] See Alaska (Alaska State Bar Bylaws, art. V, § 2); New Hampshire (N.H. Bar Assn. Const., art. V).

that "[m]odern transportation and communications practices, including email, the Internet, facsimile, express delivery, and low-cost telephone and air travel, make purely local practice a thing of the past."

Unpersuaded, the trial court denied the petition. It found no merit in Hoffman's arguments under the privileges and immunity clause, and, determining that the rational basis test rather than strict scrutiny governed the equal protection analysis, ruled that sections 6015 and 6018 passed muster under that test. This appeal followed.

## II.  DISCUSSION

A.  *Threshold Matters*

As a threshold matter, the State Bar maintains that Hoffman seeks the wrong relief from the wrong party. It casts Hoffman's efforts as improperly praying "that the State Bar exercise its discretion in fashioning a supposed remedy on a *sui generis* basis."

█ A court will issue a writ of mandate "to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specifically enjoins, . . . or to compel the admission of a party to the use and enjoyment of a right or office to which the party is entitled, and from which the party is unlawfully precluded by such inferior tribunal, corporation, board, or person." (Code Civ. Proc., § 1085, subd. (a).) Mandamus is the correct remedy for compelling an officer to conduct an election according to law. (*Wenke v. Hitchcock* (1972) 6 Cal.3d 746, 751 [100 Cal.Rptr. 290, 493 P.2d 1154].) It is also an appropriate vehicle for challenging the constitutionality of statutes and official acts. (*Ibid.*)

The State Bar is an inferior corporation. Were Hoffman correct in his claims of unconstitutional deprivation of the right to vote and run for office, the State Bar could be compelled to discontinue its adherence to the election and candidacy scheme set forth in sections 6015 and 6018 and fashion a remedy to allow Hoffman to exercise his purported rights. (*Wenke v. Hitchcock, supra,* 6 Cal.3d at p. 751.)

█ The State Bar's contention that it would have to exercise discretion in determining which district Hoffman would vote or run in, etc., is beside the point. The court's job is simply to declare the appropriate constitutional violation and the petitioner's right, and order the generic remedy—for example, to allow petitioner to vote and run for office—leaving it to the appropriate administrative and/or legislative bodies to decide how to accomplish the remedy. (See *Young v. Gnoss* (1972) 7 Cal.3d 18, 27 [101 Cal.Rptr.

533, 496 P.2d 445] [court struck down certain residency requirements and, turning to remedy, stated that it was up to legislative branch to adopt specific solution; its function was "simply to declare the minimum that must be done"].) That is to say, in addressing remedies for violations of law by other branches of government, courts may properly require governmental defendants to devise a plan to correct declared violations, but they cannot issue directives requiring such defendants to adopt a *particular* plan or system. (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 445–446 [261 Cal.Rptr. 574, 777 P.2d 610].)

Stressing that only the Legislature can change the existing statutory scheme, the State Bar also concludes that it is the wrong party. Of course the State Bar cannot effect changes in the existing statutory scheme. But if that scheme were declared unconstitutional, it is the inferior body that could be compelled to take appropriate action to fix the constitutional impairment confronting the petitioner. (Code Civ. Proc., § 1085, subd. (a).)

B. *Equal Protection: Right to Vote*

1. *Introduction*

Hoffman insists that he has a fundamental right to vote in Board elections, and thus the in-state principal office requirement which denies him the franchise must be put to close scrutiny under the equal protection clause of the California Constitution. The State Bar is satisfied that no fundamental right is implicated and, evaluating the statutes under the rational basis tests, concludes they do not run afoul of the equal protection clause.

All parties agree that determining the appropriate level of scrutiny is the key to unlocking the conundrum posed by this case. (*Gould v. Grubb* (1975) 14 Cal.3d 661, 669–670 [122 Cal.Rptr. 377, 536 P.2d 1337].) ■ Speaking generally, the right to vote is considered fundamental, preservative of other basic political rights, and, speaking generally, any alleged restriction that impinges on it demands careful or strict scrutiny. (*Reynolds v. Sims* (1964) 377 U.S. 533, 562 [12 L.Ed.2d 506, 84 S.Ct. 1362] (*Reynolds*); *Board of Supervisors v. Local Agency Formation Com.* (1992) 3 Cal.4th 903, 913 [13 Cal.Rptr.2d 245, 838 P.2d 1198].)

But determining the appropriate level of scrutiny is not a perfunctory task. Indeed, the equal protection inquiry in this case has generated a heady constitutional steam, largely because the matter at hand does not fit neatly into any established analytical mold. Thus the discussion has ranged from apportionment cases, and the "one person, one vote" mandate laid down in

the seminal *Reynolds*[6] and its progeny; to cases involving voting schemes that confine the ballot to interested voters; to an exception to the one person, one vote principle that has taken shape with respect to proprietary and special assessment public entities; and, finally, to the validity of laws which impose residency restrictions on the franchise.

We explore each of these themes, mindful that although Hoffman has only invoked article I, section 7 of the California Constitution,[7] that provision is similar to the equal protection clause of the Fourteenth Amendment of the United States Constitution. ■ When it comes to constitutional challenges to election laws, California courts closely follow the analysis of the United States Supreme Court. (*Edelstein v. City and County of San Francisco* (2002) 29 Cal.4th 164, 168 [126 Cal.Rptr.2d 727, 56 P.3d 1029] (*Edelstein*).)

2. *Summary of the Law*

(a) *Extension of Reynolds and the One Person, One Vote Principle; Early Articulation of Exception*: The United States Supreme Court first extended *Reynolds* to strike down inequitable apportionment of county precincts, ruling that the equal protection clause "permits no substantial variation from equal population in drawing districts for units of local government having general governmental powers over the entire geographic area served by the body." (*Avery v. Midland County* (1968) 390 U.S. 474, 485 [20 L.Ed.2d 45, 88 S.Ct. 1114] (*Avery*).) Significantly, the court also recognized a possible exception to the *Reynolds* imperative of equality at the polls in the case of "a special-purpose unit of government assigned the performance of functions affecting definable groups of constituents more than other[s] . . . . [These circumstances raise] the question whether such a body may be apportioned in ways which give greater influence to the citizens most affected by the organization's functions." (*Avery*, at pp. 483–484.)

Subsequently, even units of local government lacking traditional general governmental powers have been cloaked in the *Reynolds-Avery* protective web. In *Hadley v. Junior College District* (1970) 397 U.S. 50 [25 L.Ed.2d 45, 90 S.Ct. 791], the high court disapproved a formula for electing junior

---

[6] Applying "careful[] and meticulous[]" scrutiny under the equal protection clause, the *Reynolds* court endorsed the "one person, one vote" principle in the face of a grossly malapportioned state legislative districting scheme. (*Reynolds, supra,* 377 U.S. at pp. 562, 568.) "We hold that, as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis. Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State." (*Ibid.*)

[7] Article I, section 7, subdivision (a) states in part: "A person may not be . . . denied equal protection of the laws . . . ."

college district trustees that discriminated against voters in more populous school districts comprising the junior college district. The trustees performed "important governmental functions" within the district that were "general enough" and had "sufficient impact" to warrant extension of the "one person, one vote" principle to the popular election of trustees. (*Id.* at pp. 53–56.) While appearing to back off from *Avery*'s limitation to bodies with "general governmental powers," the court preserved a caveat for cases "in which a State elects certain functionaries whose duties are so far removed from normal governmental activities and so disproportionately affect different groups that a popular election in compliance with *Reynolds* . . . might not be required . . . ." (*Id.* at p. 56.)

(b) *Interest-based Restrictions on the Franchise*: Laws that restrict distribution of the franchise to members of a particular community of interest also generally receive vigorous equal protection scrutiny. For example, an interest-based statute limiting the vote in certain school districts to owners and lessees of taxable property or their spouses, and parents or guardians of public school children, was declared invalid in *Kramer v. Union School District* (1969) 395 U.S. 621 [23 L.Ed.2d 583, 89 S.Ct. 1886]. The statute impermissibly excluded many with a distinct and direct interest in decisions of the school board, while it simultaneously included others with no substantial interest in school affairs. Further, the fact that property tax supported the school district did not mean that only those subject to direct assessment experienced the effects of the tax burden. (*Id.* at pp. 630–632.) In the court's view, no less rigid examination should be applied to statutes denying the franchise outright to citizens otherwise qualified by age and residency than was applied to state apportionment schemes posing a danger of vote dilution. (*Id.* at pp. 626–627; see also *Cipriano v. City of Houma* (1969) 395 U.S. 701, 706–707 [23 L.Ed.2d 647, 89 S.Ct. 1897] [restricting franchise to property owners in revenue bond elections impermissibly denied franchise to nonproperty owners because they, as well as property owners, were substantially affected by issue of revenue bonds to finance local utilities]; *Phoenix v. Kolodziejski* (1970) 399 U.S. 204, 212–213 [26 L.Ed.2d 523, 90 S.Ct. 1990] [differences in interests of property owners and nonproperty owners were not sufficiently substantial to justify excluding nonproperty owners from voting in election to approve issuance of general obligation bonds].) But again, *Kramer* reserved the possibility that "the State in some circumstances might limit the exercise of the franchise to those 'primarily interested' or 'primarily affected.' " (*Kramer v. Union School District, supra,* 395 U.S. at p. 632.)

(c) *Emerging Exception to One Person, One Vote Principle Applied to Voting Schemes That Selectively Distribute the Franchise*: Predictably, the exception to the one person, one vote principle alluded to in *Avery* and *Hadley* has become an established doctrinal exception recognized by the United States Supreme Court and our high court as well. Interestingly, the

exception crystallized in a series of cases involving proprietary and special assessment districts, becoming engrafted on, and applied to, statutory classifications that denied the franchise outright to certain citizens. Thus, the "one person, one vote" slogan, once the expression of the basic constitutional standard for apportionment/vote dilution controversies, has, by way of superimposition of an exception to the standard, migrated to controversies over the selective distribution of the franchise.

The first fully formed articulation of this exception appears in *Salyer Land Co. v. Tulare Water District* (1973) 410 U.S. 719 [35 L.Ed.2d 659, 93 S.Ct. 1224] (*Salyer*). There, the high court encountered a specialized water district whose activities disproportionately affected the class favored to vote. The district was created for the purpose of acquiring, storing and distributing water for farming. The statute confronted in *Salyer* confined the vote for directors of the water district to landowners, and weighted their votes according to the assessed value of their land. This was a district with a "special limited purpose" (*id.* at p. 728) that did not "exercise what might be thought of as 'normal governmental' authority" (*id.* at p. 729). Moreover, its actions disproportionately affected landowners because all costs of district projects were assessed against land in proportion to the benefits received and all charges for services were collectible from those receiving the benefit in proportion to services rendered. (*Ibid.*)

The court conveyed the exception this way: "We conclude that the . . . water storage district, by reason of its special limited purpose and of the disproportionate effect of its activities on landowners as a group, is the sort of exception to the rule laid down in *Reynolds* which the quoted language from *Hadley*, *supra*, and the decision in *Avery*, *supra*, contemplated." (*Salyer, supra*, 410 U.S. at p. 728.) Employing minimal scrutiny, the court upheld the voter qualification statute as rationally based and declined to apply the popular election requirements announced in *Reynolds* and succeeding cases to the water district's election. (*Salyer*, at pp. 730–735.)

Similarly, in *Ball v. James* (1981) 451 U.S. 355 [68 L.Ed.2d 150, 101 S.Ct. 1811] (*Ball*), the court sanctioned another property-based voting scheme limiting voters to landowners and apportioning voting power according to acreage owned. Not only did the reclamation district store and deliver water, it was one of the largest suppliers of electric power in the state and met most of its capital and operating costs by selling power. The services provided by the district were far more diverse and affected far more people than those in *Salyer*, and most of the district's revenue came from the sale of electricity rather than from land-based assessments. (*Ball*, at pp. 365–366.) Despite these strikingly compelling differences, the court nonetheless concluded that "these distinctions do not amount to a constitutional difference." (*Id.* at p. 366.)

Justifying departure from popular election requirements, the court first pointed out that the district did not exercise core government powers or functions. (*Ball, supra,* 451 U.S. at p. 366.) Moreover, the district's water functions served the relatively narrow and primary mission of the district to store, deliver and conserve water for its residents. In essence the district was a business enterprise created by and mainly benefiting a specified group of landowners; it became a nominal public entity by legislative permission in order to obtain inexpensive bond financing. (*Id.* at pp. 367–369.) Further, the district's electric power business was incidental to the water functions and was not "in itself the sort of general or important governmental function that would make the government provider subject to the doctrine of the *Reynolds* case." (*Id.* at p. 369, fn. omitted.) Finally, the narrow, special functions of the district bore disproportionately on the landowner membership, the only citizens eligible to vote. (*Ibid.*)[8] If the subscribing landowners had not been assured a special vote in the conduct of district business, they might not have subscribed their lands to make the original association and then the district a reality. On this rationale, the court was satisfied that the state could rationally confine the vote to the subscribers. (*Ball,* at p. 371.)

In lockstep with *Ball* and *Salyer,* in *Southern Cal. Rapid Transit Dist. v. Bolen* (1992) 1 Cal.4th 654 [3 Cal.Rptr.2d 843, 822 P.2d 875] (*Bolen*), our Supreme Court approved a statutory scheme limiting the vote, in referenda on proposed metro rail beneficial assessment districts, to owners of commercial property who would be subject to the assessment in the event the districts were approved. The court first determined that the districts were special purpose government entities lacking virtually any indicia of government. Next, it concluded that the eligible voters were disproportionately impacted by the election issue while the disenfranchised were not as substantially affected. With these two conditions established, the court pronounced the referenda free from one person, one vote concerns, provided the statutory scheme passed the rational basis test. It did. (*Id.* at pp. 669–670, 675–676; see also this court's opinion in *Not About Water Com. v. Board of Supervisors* (2002) 95 Cal.App.4th 982, 998–999 [116 Cal.Rptr.2d 526] [holding that assessment district in question was not in any meaningful sense a government entity and that its "narrow purpose" was reflected in selective distribution of franchise to those who directly and primarily enjoyed benefits and shouldered reciprocal burdens].)

(d) *Residency Restrictions*: ▮ Bona fide residency is another acceptable restriction on the franchise. Simply put, states may require voters to be bona fide residents of the relevant political subdivision. (See *Dunn v. Blumstein*

---

[8] Specifically, only these landowners were subject to the district's acreage-based taxing power and only their lands were subject to liens to secure district bonds. Further, they were the only residents who committed capital to the district. (*Ball, supra,* 151 U.S. at pp. 370–371.)

(1972) 405 U.S. 330, 342 [31 L.Ed.2d 274, 92 S.Ct. 995]; *Pope v. Williams* (1904) 193 U.S. 621, 633–634 [48 L.Ed. 817, 24 S.Ct. 573].) As one commentator has explained: "[I]n deciding who may and who may not vote in its elections, a community takes a crucial step in defining its identity." (Tribe, American Constitutional Law (2d ed. 1988) Rights of Political Participation, § 13-10, p. 1084.) "[T]he rule that a state or municipality may restrict the franchise to its bona fide residents . . . recognizes that nonresidents may be affected by and interested in what a state or municipality does, but nonetheless accepts *territory* as the best available means of drawing a boundary for purposes of the franchise." (*Id.*, § 13-12, pp. 1088–1089, fn. omitted.)

A municipality may even exercise extraterritorial powers over individuals residing beyond its borders without affording them the municipal franchise. (*Holt Civic Club v. Tuscaloosa* (1978) 439 U.S. 60 [58 L.Ed.2d 292, 99 S.Ct. 383] (*Holt*).) Under relevant Alabama statutes, residents of Holt, an unincorporated community located on the outskirts of Tuscaloosa, were subject to the city's police, sanitary and business licensing powers, although license fees were one-half those charged within city borders. (*Id.* at pp. 61–62.) The court observed that no prior decisions had "extended the 'one man, one vote' principle to individuals residing beyond the geographic confines of the governmental entity concerned . . . . On the contrary, our cases have uniformly recognized that a government unit may legitimately restrict the right to participate in its political processes to those who reside within its borders." (*Id.* at pp. 68–69.) The court questioned whether any distinction could be drawn between those subject to a city's direct extraterritorial regulation and those burdened by indirect extraterritorial effects of internal municipal actions. (*Id.* at pp. 69–70.) Wrapping it up, the court ruled: "The line heretofore marked by this Court's voting qualifications decisions coincides with the geographical boundary of the governmental unit at issue, and we hold that appellants' case, like their homes, falls on the farther side." (*Id.* at p. 70.) Engaging in minimal scrutiny, the court found the rational basis test easily met (*id.* at p. 74), but in a footnote did distinguish the present situation from a city which exercised *all* of its powers over citizens in a surrounding unincorporated territory[9] (*id.* at pp. 72–73, fn. 8).

## 3. *Analysis*

■ Although there are sprinklings of doctrinal inconsistency within the equal protection/voting rights precedents surveyed above, several consistent themes emerge: First, in deciding whether the denounced voting scheme touches on the fundamental right to vote, courts should consider the extent to

---

[9] Tuscaloosa had no authority to levy ad valorem taxes, invoke eminent domain or zone property in the unincorporated area. (*Holt, supra*, 439 U.S. at p. 73, fn. 8.)

which the purpose and powers of the governmental entity in question are limited and deviate from those reflected in more traditional units of government. Concurrently, courts should consider whether the functions performed by that entity disproportionately impact the franchised group. Second, bona fide residency requirements are an acceptable means of conferring the franchise. Third, if the voting rights issue has been dispatched, the test is whether the statutory classification "bear[s] some rational relationship to a legitimate state purpose." (*Holt, supra,* 439 U.S. at p. 70.)

■ Turning to the present matter, it is evident that the State Bar is a limited, special-purpose unit of state government. Primarily an advisory body, the State Bar is not vested with, nor does it exercise, any general governmental powers. While it is responsible for carrying out various statutory and constitutional responsibilities, its duties are conferred, circumscribed and overseen by the Legislature and Supreme Court. Moreover, what power the State Bar does exert is in furtherance of its narrow mission of serving as an "administrative arm" of the Supreme Court for the purpose of assisting in matters of admission, discipline and regulation of attorneys practicing law in California courts. (*In re Attorney Discipline System, supra,* 19 Cal.4th at pp. 599–600.)[10]

But we must also ask: Do the activities of the State Bar disproportionately affect those empowered to vote as opposed to those excluded? (*Ball, supra,* 451 U.S. at p. 370; *Salyer, supra,* 410 U.S. at p. 728; *Bolen, supra,* 1 Cal.4th at p. 671.) Or, in language Hoffman seizes upon, does the voting classification "reflect the narrow primary purposes for which the [State Bar was] created." (*Ball, supra,* 451 U.S. at p. 369.)

Asserting that the State Bar's purpose is to regulate California lawyers, appellant reasons that under the limited-purpose entity test, "the franchise in a state bar may be limited *to lawyers*" licensed to practice law in a given state. On the other hand, the principal office requirement goes too far because it

---

[10] On the sole basis of the limited purpose of the Board of Commissioners of the Alabama State Bar, which exercised powers more accurately described as judicial than legislative, a United States district court held that the constitutional principle of "one man, one vote" had no relevancy to the asserted malapportionment of the board. (*Sullivan v. Alabama State Bar* (M.D.Ala. 1969) 295 F.Supp. 1216, 1222–1223, affd. (1969) 394 U.S. 812 [22 L.Ed.2d 749, 89 S.Ct. 1486]; see also *Brady v. State Bar* (9th Cir. 1976) 533 F.2d 502, 503 [relying on binding summary disposition in *Sullivan* to dismiss action challenging validity of California's legal specialization program because it was created by malapportioned board of State Bar].) We note that the precedential effect of a summary affirmance extends only to the precise issues framed and necessarily decided in the case below. (*Anderson v. Celebrezze* (1983) 460 U.S. 780, 784–785, fn. 5 [75 L.Ed.2d 547, 103 S.Ct. 1564] (*Anderson*).) Moreover, despite the State Bar's insistence that these cases are dispositive, *Sullivan* was handed down prior to *Salyer* and *Ball,* which established a two-pronged, special-purpose entity test. We evaluate the present challenge under the more developed test evident in those cases.

destroys the crucial link between the organization's limited purpose and the suffrage scheme. Given that the financial and professional obligations imposed on members of the State Bar burden those who maintain their offices here as well as those who do not, appellant posits that unlike *Salyer* and *Ball*, there is no disproportionate impact on the enfranchised group.

This is so, up to a point; certainly those whose primary place of business is elsewhere and who, as a result, do not regularly practice in California still must pay dues, satisfy MCLE and "interest on lawyer trust account" requirements, adhere to the rules of professional conduct and submit to disciplinary actions instituted against them. While Hoffman and others like him cannot escape these burdens, by logic those who *do* maintain their principal offices and regularly practice here experience more fully the impact and reach of most State Bar activities and have a far greater objective stake in the organization's affairs. These activities and affairs, which focus on improving the legal profession and practice of law *in this state*, include formulating rules of professional conduct; engaging in study and recommendation of changes in procedural law; preventing the unlawful practice of law; and disciplining members for misconduct.

We realize that this case does not mesh perfectly with the benefits and burden analysis developed in proprietary/assessment district cases. Unlike the plaintiffs in those cases, Hoffman is not exempt from key burdens such as payment of dues and compiling of MCLE credits. The distinguishing feature is that although the State Bar is a constitutional body, it is a *professional association* and as such performs important functions and activities in furtherance of bettering the profession that do not fit the benefit/burden model developed in *Salyer*, *Ball* and *Bolen*. Moreover, as discussed above, the State Bar's regulatory functions are relegated to second chair status; the Legislature and Supreme Court hold and consistently exercise ultimate power over attorneys practicing law in this state. Thus the vantage point for assessing the regulatory impact on professionals such as Hoffman is not the State Bar in isolation, but the State Bar and the Legislature and Supreme Court. Yet Hoffman does not assert a constitutional right to vote for state legislators who set the maximum state bar dues and mandated the MCLE program in the first instance, or to recall or confirm Supreme Court justices who ultimately pass on disciplinary matters. Therefore, we conclude it is enough that the functions and activities of the State Bar have a significantly disproportionate effect on those enfranchised to vote for Board members, notwithstanding that the disenfranchised bear some of the same burdens. Moreover, because the principal place of business requirement validates the enfranchised group's far greater objective interest and stake in State Bar affairs, it is a reflection of the narrow primary purpose of the State Bar to assist in regulating and improving the legal profession *in this state*.

That Hoffman suffers certain regulatory burdens is not dispositive for another reason. *Holt* teaches that a government entity may exercise limited powers over nonresidents without extending the franchise to them. (*Holt, supra*, 439 U.S. at pp. 68–69.) And while the State Bar is not a territorial entity, its sway most certainly is territorial, confined to this state only. The State Bar can only influence the practice of law and the legal profession in California. It follows that when it comes to the regulatory reach of an entity created to aid the regulation of a profession within the territorial boundaries of a state, the in-state principal place of business concept becomes the functional equivalent of bona fide residency. Reserving the right to vote to those who practice regularly here and thus are most affected by the State Bar's regulation of the profession is akin to reserving the vote on municipal affairs to those residing within the municipality's borders, notwithstanding direct and indirect impacts on nonresidents. Therefore, consistent with *Holt*, the financial and professional obligations imposed on attorneys licensed to practice law in California can be imposed on attorneys who do not maintain their principal office here without extending the State Bar franchise to them.

Hoffman points out that unlike State Bar dues which are not discounted for him and others similarly situated, in *Holt* the business license fees for nonresidents were half the amount charged those within city walls. This is the reverse of the present situation. The State Bar has no power to exact a fee from Hoffman for the legal business he conducts in Arizona. The dues it does collect goes to fund the panoply of activities and functions described above that must be in place to support the regulation of the legal profession in California. These functions and activities must be in place regardless of whether any individual dues-paying member practices regularly, occasionally, or not at all.[11] This reality is analogous to monthly fees one might pay to belong to a gym: the facilities and equipment must be paid for and maintained regardless of whether a member uses the gym on a daily, weekly or monthly basis, or not at all.

As well, Hoffman reminds us that the *Holt* court recognized it was not faced with a situation in which the municipality exercised *precisely* the same powers over residents and nonresidents. But *Holt* was concerned with the extraterritorial exercise of *general municipal powers*. On the other hand, the State Bar is a *limited-purpose* entity that exercises powers that are *primarily advisory* in nature. Moreover, we reiterate the general proposition that the influence and impact of the State Bar on members maintaining their principal offices outside California is not coterminous with the influence and impact it

---

[11] This is not to say that there would be no merit in a dues structure that differentiated between those with principal offices here versus elsewhere. We are merely saying the lack of differentiation makes no constitutional difference.

wields on those who regularly practice here. Additionally, the influence it does wield is second place to the influence of the home state bar. Thus the *Holt* concern is inapt.

■ For all these reasons, we hold that the one person, one vote principle does not apply to the voting scheme for State Bar board members.

There is one more hoop we must jump through in our equal protection analysis: Is there " 'any state of facts [that] reasonably may be conceived to justify' " (*Bolen, supra,* 1 Cal.4th at pp. 675–676, quoting *Salyer, supra,* 410 U.S. at p. 732) this voting scheme? Restricting voters to active members with a principal office in the California district where they seek to vote promotes the legitimate purpose of local representation. Local constituencies have a strong interest in ensuring that their board representatives understand, and will respond to and advance, their interests and concerns. Taken as a whole, these interests and concerns represent the pressing issues peculiar to the practice of law and regulation of the legal profession *in California.* With voting and candidacy requirements ensuring that members and candidates in a given district maintain their principal office, and by logic primarily practice there, the scheme encourages acquaintanceship between members and candidates and maximum exposure to issues relevant to each district. This consideration is significant given the size of our state and the diversity of its population and legal needs and concerns. By defining the relevant political community through the principal place of business, the Legislature could reasonably conclude that enfranchised members have a far greater objective interest and stake in the outcome of State Bar Board decisions than members denied the franchise, and that such decisions would thus be more responsive to and reflective of these concerns.

Hoffman calls our attention to authority that does not bear on the rational basis analysis pertinent to the matter at hand. (See *Frazier v. Heebe* (1987) 482 U.S. 641, 649 [96 L.Ed.2d 557, 107 S.Ct. 2607] [labeling as "unnecessary and irrational" a district court rule—based on concerns of competency and availability of attorneys—which required applicants for general admission to its bar to either reside or maintain office in state where court sat]; *Quinn v. Millsap* (1989) 491 U.S. 95, 107, 109–110 [105 L.Ed.2d 74, 109 S.Ct. 2324] [finding no rational justification for land ownership requirement for appointees to governmental advisory board empowered to draft and submit plan to reorganize entire governmental structure of city].) That we find sections 6015 and 6018 rationally based does not mean that another scheme, for example an out-of-state district with attendant voting rights for Hoffman

and others, might not also be rationally based.[12] We simply conclude that our Constitution does not require this result.

C. *Equal Protection: Candidacy*

Just as the in-state principal office requirement serves as the functional equivalent of bona fide residency for purposes of defining the relevant political community of voters for the State Bar Board, so, too, it serves the same purpose in defining the relevant political subdivision for purposes of candidate eligibility. No one disputes that candidates for public office should be bona fide residents of the relevant political subdivision. Indeed, states have "compelling" reasons for requiring candidates to establish their residence and eligibility for office within a reasonable and fixed time prior to an election. (*Johnson v. Hamilton* (1975) 15 Cal.3d 461, 472 [125 Cal.Rptr. 129, 541 P.2d 881]; *Daniels v. Tergeson* (1989) 211 Cal.App.3d 1204, 1211 [259 Cal.Rptr. 879].)

Hoffman is adamant that being frozen out of the candidacy pool for the State Bar Board contravenes his state constitutional rights, citing *Choudhry v. Free* (1976) 17 Cal.3d 660 [131 Cal.Rptr. 654, 552 P.2d 438] as the governing case. There our Supreme Court used strict scrutiny to invalidate a statute requiring directors of irrigation districts to be freeholders, as applied to prevent a nonproperty owner's candidacy for director of the largest irrigation district in the state. (*Id.* at pp. 668–669.) Specifically, the court asked whether the freeholder requirement had a " 'real and appreciable impact' upon the equality, fairness and integrity of the electoral process." (*Id.* at p. 664.)

Decided after *Salyer* but before *Ball*, the court in *Choudhry* distinguished the scope of governmental powers of the *Salyer* water storage district from the more expansive powers of the Imperial Irrigation District, and contrasted the limited effect of district activities in *Salyer* with those of the irrigation district. (See *Choudhry v. Free, supra,* 17 Cal.3d at pp. 663–664, 667–668.) Interestingly, nonlandowning residents of the district *could* vote for directors and thus there was a glaring disconnect in qualifications for voters and candidates.

Here, there is synchronicity of voting and candidacy requirements. And although the scheme excludes some dues-paying members from pursuing candidacy, the geographical constraints on candidates for this limited-purpose governmental entity mark appreciable differences between those who have

---

[12] We note from the January 2001 tentative draft minutes of the Board that the State Bar has a multijurisdictional practice committee and that the bar and the California Supreme Court are studying the issue as it relates to California.

principal offices and primarily practice here and those who do not. Likewise, we are not persuaded that section 6015 has a "real and appreciable impact" on the equality and fairness of the electoral process. As the court in *Choudhry* noted, not every classification restricting eligibility for those seeking the public's suffrage is subject to strict scrutiny. (*Choudhry v. Free, supra,* 17 Cal.3d at p. 664.) Therefore, we conclude that section 6015 may be put to the rational basis test.

We start with the reality that the State Bar exists to assist in regulating the legal profession in this state. It is a limited-purpose entity. Thus, while one technically can characterize a Board candidate as a candidate for "public office," in reality Board members have little in common with elected officials of entities holding general governmental powers. In keeping with the State Bar's narrow purpose, the Legislature could reasonably reserve Board candidacy for those attorneys most likely to regularly engage in legal practice and participate in legal affairs *in this state*. Such candidates are more likely to have extensive ties to legal communities in this state; be familiar with the problems and issues facing those communities; and be readily accessible to lawyers practicing in their respective in-state districts. The California legal profession is not likely to be a primary concern of a lawyer who occasionally practices here but maintains his or her principal office elsewhere and devotes the bulk of professional time and energy to legal practice and affairs in another jurisdiction. If the focus of one's practice shifted to California, of course the attorney could relocate his or her practice here, and run for office and vote in Board elections.

### D. *Free Speech Assertions*

Assailing sections 6015 and 6018 as violative of the free speech clause of the California Constitution, at the 11th hour Hoffman seeks to tether his cause to a succession of ballot access cases articulating a balancing test for state election laws that impinge on First Amendment associational rights. As this concern surfaces for the first time on appeal,[13] we need not address it. Nonetheless, in the interest of giving Hoffman's concerns a full constitutional vetting, we entertain the argument, beginning with a summary of major cases articulating and refining the balancing test.

---

[13] Hoffman insists he made this argument below, pointing to a conclusory footnote in his reply memorandum in which he stated that the constitutional test employed in ballot access cases could not be met. This statement does not double as legal argument—it does not spell out the interests at stake, nor does it undergo the balancing required by the test.

## 1. *Development of Ballot Access Balancing Test*

■ With its decision in *Anderson, supra,* 460 U.S. 780,[14] the high court honed a balancing test for assessing the constitutionality of election ballot laws. This test explicitly recognized the friction between voters' rights of political association and to cast an effective vote, and the need for state regulation to ensure that elections are orderly, open and fair. (*Id.* at pp. 787–789.) *Anderson* phrased the test this way: "[A court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." (*Id.* at p. 789.)

The *Anderson* test was refined in *Burdick v. Takushi* (1992) 504 U.S. 428 [119 L.Ed.2d 245, 112 S.Ct. 2059] (*Burdick*). There the court held that Hawaii's total ban on write-in voting did not infringe unreasonably on its voters' rights to make free choices and associate politically through their vote. (*Id.* at pp. 438–440.) *Burdick*'s contribution clarifies that when an election regulation subjects voters' constitutional rights to " 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' [Citation.] But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' . . . , 'the State's important regulatory interests are generally sufficient to justify' the restrictions." (*Id.* at p. 434.) Reiterating this conclusion, the court explained: "[W]hen a State's ballot access laws pass constitutional muster as imposing only reasonable burdens on First and Fourteenth Amendment rights—as do Hawaii's election laws—a prohibition on write-in voting will be presumptively valid, since any burden on the right to vote for the candidate of one's choice will be light and normally will be counterbalanced by the very state interests supporting the ballot access scheme." (*Id.* at p. 441.) The court in *Burdick* also stated generally that "[t]he appropriate standard for evaluating a claim that a state law burdens the right to vote is set forth in *Anderson.*" (*Id.* at p. 438.)

---

[14] In *Anderson* the court struck down Ohio's early filing deadline for independent candidates for president, emphasizing that the regulation particularly burdened the ability of the state's "independent-minded voters"—whose political preferences resided outside the existing political parties—to associate in the electoral arena. (*Anderson, supra,* 460 U.S. at pp. 794–795.)

More recently, Minnesota's antifusion laws, which prohibit an individual from appearing on the ballot as a candidate of more than one party, withstood constitutional challenge by a minor political party. (*Timmons v. Twin Cities Area New Party* (1997) 520 U.S. 351 [137 L.Ed.2d 589, 117 S.Ct. 1364] (*Timmons*).)[15] Characterizing the core-protected First Amendment activity of political association as including the right to create and develop new political parties, the court also acknowledged, as a practical reality, that "[s]tates may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." (*Id.* at p. 358.) Disagreeing with the lower court's determination that Minnesota's fusion ban inflicted severe burdens on the minor party's associational rights thereby triggering the need to demonstrate it was narrowly tailored to serve compelling state interests, the court said it was enough that the state's asserted regulatory interests were sufficiently weighty to justify the intrusion on the party's rights. (*Id.* at pp. 363–364.) Moreover, the court would not "require elaborate, empirical verification of the weightiness of the State's asserted justifications." (*Id.* at p. 364.)

Subsequently, our Supreme Court relied on the *Anderson/Burdick* test to sustain, against challenge under California's free speech clause, San Francisco's ban on write-in voting in runoff elections for municipal offices. (*Edelstein, supra,* 29 Cal.4th at p. 167.) The *Edelstein* court pointed out that both *Burdick, supra,* 504 U.S. 428, and its own earlier opinion in *Canaan v. Abdelnour* (1985) 40 Cal.3d 703 [221 Cal.Rptr. 468, 710 P.2d 268] voiced the same *Anderson* standard. However, unlike *Burdick,* which came later, the court in *Canaan* concluded that a ban on write-in voting severely restricted voting rights. (*Canaan,* at p. 727.) At bottom the two courts differed on the value of the expressive function of voting. (*Edelstein, supra,* 29 Cal.4th at pp. 174–175, 180–181.) Consistent with *Burdick,* the *Edelstein* court found the ban on write-in voting in run-off elections only denied voters the chance to cast a write-in ballot twice, and thus imposed but a limited burden on voting rights. (*Edelstein,* at p. 182.) The city's interest in making sure its mayors were elected by a majority rather than a plurality honored "the centrality of the concept of majority rule" and was "presumptively valid." (*Id.* at p. 183.)

### 2. *Analysis*

Hoffman believes that this line of cases spells victory for his cause. It does not.

---

[15] "Fusion," also dubbed "cross-filing" or "multiple-party nomination," refers to " 'the nomination by more than one political party of the same candidate for the same office in the same general election.' " (*Timmons, supra,* 520 U.S. at pp. 353–354, fn. 1.)

First, the cases summarized all involve structural regulation of elections and ballots—e.g., early cutoff dates for independent candidate filing; prohibitions on write-in candidates; and a ban on multiple-party candidacies for elected office. On the other hand, sections 6015 and 6018 are statutes which cast the defining string to form the political community comprising, and voting for, the State Bar Board. They do not regulate the *process* of the State Bar elections or the ballot.

Second, these laws do not implicate Hoffman's or any one else's associational freedoms. They do not discourage any particular viewpoint or content. Indeed, if Hoffman's concern is that the viewpoint and interests of out-of-state active members collectively differ from those of in-state members, those interests and viewpoints are not squelched by the laws in question. Out-of-state residents who maintain their principal law offices here can run for office and vote in State Bar Board elections.

Third, the burdens asserted by Hoffman—"complete disenfranchisement" and "total disqualification" are identical to the equal protection injuries he has asserted. His real complaint is with the classifications established in the first instance. We believe that statutes such as these which initially allocate the franchise and define the candidate pool lend themselves more readily to traditional equal protection analysis. In this vein we do not read the broad pronouncement in *Burdick* (and echoed in *Edelstein*)—that *Anderson* sets the "appropriate standard for evaluating a claim that a state law burdens the right to vote"[16]—as disapproving traditional equal protection analysis in these situations. Rather, read in the context of ballot access concerns, once the stage is set, the exclusivity of the *Anderson/Burdick* test is reserved for rules that impact the *manner* of exercising the vote or pursuing candidacy.

Fourth, the *Anderson/Burdick* test has been developed in the context of laws regulating general, at-large elections as opposed to elections of specialized, limited-purpose entities which implicate, on an objective scale, less significant political rights.

Fifth, even if *Anderson/Burdick* were the appropriate test, Hoffman would lose. The burden on Hoffman's associational rights is minimal and more than adequately counterbalanced by the state's interests in supporting the scheme. Should he so choose, he could open his principal offices in California. As well, without moving, Hoffman can participate on State Bar committees and sections, endorse and campaign for candidates, and contribute to their campaigns.

---

[16] *Burdick, supra*, 504 U.S. at page 438; *Edelstein, supra*, 29 Cal.4th at page 177.

■ The in-state principal office requirement set forth in sections 6015 and 6018 advances California's worthy interests in fostering local participation in the practice of law; recognizing and addressing issues unique to the diverse districts in this state; and promoting and preserving the effective regulation of California's legal profession by valuing the investment of constituents who regularly practice here. Further, California has a legitimate interest in filtering out frivolous candidacies that lack connection with the significant issues confronting the legal profession and practice of law in this state. (*Timmons, supra,* 520 U.S. at pp. 364–365.) These interests are "sufficiently weighty" to justify the restrictions. Elaborate empirical verification of the weightiness of these justifications is not required. (*Timmons, supra,* 520 U.S. at p. 364.)

## III. CONCLUSION; DISPOSITION

Hoffman's assault on sections 6015 and 6018 poses interesting policy questions concerning the continued wisdom of the in-state principal office requirement, particularly given the realities of modern transportation and communication practices that encourage multijurisdictional practice of the law. We can contemplate a day when the State Bar's multijurisdictional task force, some other committee of the State Bar, the Board or the Legislature itself takes up the issue and puts it to rigorous examination. This is as it should be. But we are not obliged, under the California Constitution, to compel the State Bar to abandon the requirement.

The order denying Hoffman's petition for writ of mandate is affirmed.

Kay, P. J., and Rivera, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 18, 2004.