[No. C039942. Third Dist. Feb. 10, 2003.]

HOWARD JARVIS TAXPAYERS ASSOCIATION et al., Plaintiffs and Respondents, v.
CITY OF ROSEVILLE, Defendant and Appellant.

1180

COUNSEL

Mark J. Doane and Richard G. Glenn, City Attorneys; Eisen & Johnston Law Corporation, Jay-Allen Eisen, Marian M. Johnston, Frederic L. Snowden; Law Office of Dennis W. De Cuir, Dennis W. De Cuir and F. Ronald Laupheimer for Defendant and Appellant.

Trevor A. Grimm, Jonathan M. Coupal and Timothy A. Bittle for Plaintiffs and Respondents.

OPINION

SCOTLAND, P. J.—At the November 7, 2000, General Election, a majority of the voters of the City of Roseville (the City) voted to approve two conflicting tax measures. Measure Q proposed to ratify the City's utility user's tax and to restrict use of its revenues to certain specified purposes. Measure S proposed to repeal the City's utility user's tax.

In an action for declaratory relief brought by plaintiffs Howard Jarvis Taxpayers Association and Phil Ozenick, the trial court determined that Measure Q proposed a special tax requiring approval by two-thirds of the voters and that, because it did not obtain such approval, Measure Q was ineffective for any purpose. The court determined that Measure S required majority approval, was so approved, and effectively repealed the utility user's tax. The City appeals. We agree with the trial court and shall affirm the judgment.

BACKGROUND

The City is a charter city. In 1971, its city council, without a vote of the electorate, adopted by ordinance a utility user's tax on electricity. In 1990, again without a vote of the electorate, the tax was expanded to include other utilities, including water, telephone, sewer, refuse, gas, and cable television. The ordinance established a general tax, i.e., the revenues from the tax were paid into the City's general fund for the unrestricted use of the City. The tax has not been increased or otherwise amended since 1990.

For the November 7, 2000, General Election, citizens of the City qualified an initiative, Measure S, to repeal the utility user's tax and to prohibit the City from imposing such a tax. The initiative also provided that it could not be amended or superseded except upon approval by the voters.

In response to Measure S, the city council placed Measure Q before the voters to ratify the utility user's tax and incorporate it as a charter provision. Measure Q also provided: "All Utility Users Tax Revenue received shall be budgeted and appropriated solely for police, fire, parks and recreation or library services."

Measure Q and Measure S each received a majority vote of those who voted. Measure Q, to ratify the tax, incorporate it as a charter provision, and restrict the use of its revenues, received 16,763 yes votes and 15,328 no votes. Measure S, to repeal the utility user's tax, received 16,674 yes votes and 15,851 no votes. Thus, Measure Q received 89 more yes votes and 523 fewer no votes than did Measure S. In percentage terms, Measure Q received a 52.24 percent yes vote and Measure S received a 51.27 percent yes vote among those who voted on the respective measures.

Since the election, the City has continued to collect the utility user's tax. Plaintiffs brought this action for declaratory relief. Ruling on a motion for summary judgment, the trial court concluded Measure Q imposed a special tax for which a two-thirds vote of the electorate is required. (Cal. Const., art. XIII C.) Since Measure Q did not receive approval from two-thirds of the voters, the court found it did not pass and is of no effect. The court concluded Measure S required only a majority vote. Thus, the court found that it did pass and effectively repealed the City's utility user's tax. Judgment was entered accordingly.

DISCUSSION

I

In 1978, the voters added article XIII A to California's Constitution to significantly change our system of real property taxation and tax procedure. (See *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 218 [149 Cal.Rptr. 239, 583 P.2d 1281].) That measure, often referred to as Proposition 13, is best known for its restrictions on the maximum real property tax that may be imposed. (*Id.* at p. 220.) It also included a restriction on other types of local taxation. (*Ibid.*) Section 4 of article XIII A provides: "Cities, Counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district."

In *City and County of San Francisco v. Farrell* (1982) 32 Cal.3d 47 [184 Cal.Rptr. 713, 648 P.2d 935], our state Supreme Court was called upon to

define the term "special taxes" as used in California Constitution article XIII A. It was vigorously argued that "special taxes" were intended to refer to any taxes imposed by a local government or district other than ad valorem property taxes. The court conceded that this was one reasonable interpretation of the term. (32 Cal.3d at p. 56.) However, the court found the term to be ambiguous and opted for strict construction. (*Id.* at pp. 53, 57.) The court construed the term "to mean taxes which are levied for a specific purpose rather than . . . a levy placed in the general fund to be utilized for general governmental purposes." (*Id.* at p. 57; see also *Rider v. County of San Diego* (1991) 1 Cal.4th 1, 15 [2 Cal.Rptr.2d 490, 820 P.2d 1000].) That decision was the genesis of the distinction between general taxes and special taxes that would be utilized in subsequent initiative measures.

At the November 4, 1986, General Election, the voters approved Proposition 62, which added sections 53720 through 53730 to the Government Code. Section 53721 of that code states: "All taxes are either special taxes or general taxes. General taxes are taxes imposed for general governmental purposes. Special taxes are taxes imposed for specific purposes." Government Code section 53722 provides that a local government may not impose a special tax unless and until the tax is submitted to the electorate and is approved by a two-thirds vote of the voters voting on the issue. Pursuant to Government Code section 53723, a local government may not impose a general tax unless and until the tax is submitted to the voters and is approved by a majority of the voters voting on the issue.[1]

In *Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220 [45 Cal.Rptr.2d 207, 902 P.2d 225], the Supreme Court rejected various arguments that Proposition 62 was unconstitutional, and upheld the measure. The court found it unnecessary to determine whether Proposition 62, as a statutory measure, can be applied to charter cities. (*Id.* at pp. 260-261.)

At the November 5, 1996, General Election, the voters added article XIII C to the California Constitution by approving Proposition 218. Article XIII C states in full:

"Section 1. Definitions. As used in this article:

"(a) 'General tax' means any tax imposed for general governmental purposes.

---

[1]While a general tax may be imposed if approved by a majority of the voters, a general tax may not be submitted to the voters unless it is approved by a two-thirds vote of the legislative body of the local government. (Gov. Code, § 53724, subd. (b).)

"(b) 'Local government' means any county, city, city and county, including a charter city or county, any special district, or any other local or regional governmental entity.

"(c) 'Special district' means an agency of the State, formed pursuant to general law or a special act, for the local performance of governmental or proprietary functions with limited geographic boundaries including, but not limited to, school districts and redevelopment agencies.

"(d) 'Special tax' means any tax imposed for specific purposes, including a tax imposed for specific purposes, which is placed into a general fund.

"Sec. 2. Local Government Tax Limitation. Notwithstanding any other provision of this Constitution:

"(a) All taxes imposed by any local government shall be deemed to be either general taxes or special taxes. Special purpose districts or agencies, including school districts, shall have no power to levy general taxes.

"(b) No local government may impose, extend, or increase any general tax unless and until that tax is submitted to the electorate and approved by a majority vote. A general tax shall not be deemed to have been increased if it is imposed at a rate not higher than the maximum rate so approved. The election required by this subdivision shall be consolidated with a regularly scheduled general election for members of the governing body of the local government, except in cases of emergency declared by a unanimous vote of the governing body.

"(c) Any general tax imposed, extended, or increased, without voter approval, by any local government on or after January 1, 1995, and prior to the effective date of this article, shall continue to be imposed only if approved by a majority vote of the voters voting in an election on the issue of the imposition, which election shall be held within two years of the effective date of this article and in compliance with subdivision (b).

"(d) No local government may impose, extend, or increase any special tax unless and until that tax is submitted to the electorate and approved by a two-thirds vote. A special tax shall not be deemed to have been increased if it is imposed at a rate not higher than the maximum rate so approved.

"Sec. 3. Initiative Power for Local Taxes, Assessments, Fees and Charges. Notwithstanding any other provision of this Constitution, including, but not limited to, Sections 8 and 9 of Article II, the initiative power shall not be

prohibited or otherwise limited in matters of reducing or repealing any local tax, assessment, fee or charge. The power of initiative to affect local taxes, assessments, fees and charges shall be applicable to all local governments and neither the Legislature nor any local government charter shall impose a signature requirement higher than that applicable to statewide statutory initiatives."

## II

The City opens with the assertion that, as a statutory initiative, Proposition 62 does not apply to it as a charter city. While plaintiffs claim this case may be resolved under Proposition 218, they argue that the applicability of Proposition 62 to charter cities has not been fully and properly analyzed. Thus, they urge us to reach the issue. We decline the invitation. ■ Plaintiffs commenced this litigation for the sole purpose of obtaining a declaration that Measure Q required a two-thirds vote for approval and thus was not approved by the voters of the City. There is no question that Proposition 218, as a constitutional initiative, is binding upon charter cities. We agree with the trial court that the issue presented is fully resolved by reference to Proposition 218. That being so, consideration of the application of Proposition 62 to charter cities would result in nothing more than an advisory opinion, i.e., "*dictum* pure and simple." ■ (*Young v. Three for One Oil Royalties* (1934) 1 Cal.2d 639, 648 [36 P.2d 1065].) We are constrained by sound judicial policy against reaching out to pronounce upon the constitutionality of a duly enacted statute unless necessary to do so to resolve a case or controversy before us. (*Palermo v. Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 65 [195 P.2d 1].) Accordingly, we proceed to a discussion of Proposition 218.

## III

Under Proposition 218, a special tax is any tax imposed for specific purposes, even if the proceeds are placed into a general fund. (Cal. Const., art. XIII C, § 1, subd. (d).) In contrast, a general tax is a tax imposed for general governmental purposes. (Cal. Const., art. XIII C, § 1, subd. (a).) ■ Pursuant to these definitions, a tax is special whenever expenditure of its revenues is limited to specific purposes; this is true even though there may be multiple specific purposes for which revenues may be spent. (*Monterey Peninsula Taxpayers Assn. v. County of Monterey* (1992) 8 Cal.App.4th 1520, 1535 [11 Cal.Rptr.2d 188].) A tax is general only when its revenues are placed into the general fund and are available for expenditure for any and all governmental purposes. (*Ibid.*) A special tax must be

submitted to the electorate and approved by a two-thirds vote. (Cal. Const., art. XIII C, § 2, subd. (d).)

■ Measure Q proposed to incorporate the utility user's tax into the city charter. The proposed charter provision provided that all revenue from the tax shall "be budgeted and appropriated solely for police, fire, parks and recreation or library services." On its face, Measure Q proposed a special tax that required a two-thirds majority for approval pursuant to Proposition 218.

The City points out that the utility user's tax has been imposed on use of electricity since 1971 and on the use of other utilities since 1990. Consequently, the City asserts that Measure Q did not impose a new or different tax, and thus did not "impose, extend, or increase any special tax" within the meaning of Proposition 218. We cannot agree.

Measure Q proposed two significant changes in the existing utility tax. First, it would incorporate the tax into the city charter. A city charter may be amended, revised or repealed only by majority vote of the electorate. (Cal. Const., art. XI, § 3, subd. (a); Gov. Code, § 34450 et seq.) Thus, Measure Q would have placed the tax beyond the control of the city council. That body would have no power to increase, decrease, amend, or repeal the utility user's tax, in whole or in part, without a majority vote of the electorate. Second, Measure Q proposed to restrict the use of revenues from the tax to the purposes of police, fire, parks and recreation or library services. This, as we have said, would make the tax a special tax.

■ A city charter is "the supreme law of the City, subject only to conflicting provisions in the federal and state Constitutions and to preemptive state law." (*Domar Electric, Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161, 170 [36 Cal.Rptr.2d 521, 885 P.2d 934].) A charter city may not act in conflict with its charter. (*Id.* at p. 171.) "Any act that is violative of or not in compliance with the charter is void." (*Ibid.*) Any provision in an existing ordinance that is in conflict with a self-executing provision of the charter is, upon adoption of the charter provision, deemed to be repealed. (*King v. Leavy* (1932) 124 Cal.App. 422, 429 [12 P.2d 661].)

■ In this light, Measure Q would have imposed a special tax. The measure would incorporate the utility user's tax into the city charter and restrict the use of its revenues to specific purposes. By operation of law, the approval of Measure Q would have been deemed to be a repeal of the existing and conflicting utility user's tax ordinance. Therefore, in legal effect, Measure Q proposed the repeal of a general tax and its replacement with a special tax. No artful use of semantics can avoid the conclusion that Measure Q proposed to impose a special tax for purposes of Proposition 218.

The City points out that, although Measure Q would limit the use of tax revenues to specific purposes, the measure does not provide a formula for allocation of revenues among those purposes. In the City's view, this precludes Measure Q from being construed as proposing a special tax. We disagree. Nothing in Proposition 218 requires or suggests that, to be a special tax, a proposed tax must provide a detailed formula for allocations of revenues. To the contrary, a special tax is "any tax imposed for specific purposes" even if revenues are placed into a general fund. (Cal. Const., art. XIII C, § 1, subd. (d).)

Measure Q proposed such a tax. To conclude otherwise would create a loophole sufficient to entirely subvert the will of the electorate expressed in Proposition 218. (See *Rider v. County of San Diego, supra,* 1 Cal.4th at p. 15.)

The City points out that it normally allocates over 50 percent of its general fund to the purposes of police, fire, parks and recreation, and library services, and that the revenue from the utility user's tax is sufficient to cover less than 25 percent of these expenditures. The City argues that, because this tax is insufficient to fully fund the purposes proposed by Measure Q, the tax proposed by Measure Q was at worst "some kind of hybrid tax" which should not be subject to a supermajority requirement.

Again we disagree. Proposition 218 does not permit a local tax to be considered some kind of hybrid. Rather, it requires that local taxes be deemed either general taxes or special taxes. (Cal. Const., art. XIII C, § 2, subd. (a).) The measure defines "special tax" in a manner that clearly encompasses the tax proposed by Measure Q. We are not at liberty to ignore the unambiguous language of either Proposition 218 or Measure Q. Thus, we conclude that the tax proposed by Measure Q would be a special tax requiring a two-thirds vote.

The City argues that, even if Measure Q required a two-thirds vote and therefore did not pass, its failure did not affect the existing utility user's tax ordinance. As we already have noted, if Measure Q had been approved, it would be deemed to have repealed the conflicting utility user's tax ordinance. However, Measure Q was not approved, and its failure, by itself, did not affect the existing ordinance. What was approved is Measure S, which required only a majority vote. And that measure repealed the utility user's tax ordinance.

The City contends that, because Measure Q received a higher affirmative vote than Measure S, it precludes giving effect to Measure S even though Measure Q failed to obtain a two-thirds voter approval. The contention fails.

It is well settled that, when two or more measures approved at the same election are in conflict, the measure that received the higher affirmative vote prevails. (Cal. Const., art. II, § 10, subd. (b) [applicable to statewide elections]; art. XI, § 3, subd. (d) [applicable to local elections]; Elec. Code, § 9221 [applicable to cities]; *Taxpayers to Limit Campaign Spending v. Fair Pol. Practices Com.* (1990) 51 Cal.3d 744, 765 [274 Cal.Rptr. 787, 799 P.2d 1220]; *Sacramento County Deputy Sheriffs' Assn. v. County of Sacramento* (2000) 85 Cal.App.4th 960, 965 [102 Cal.Rptr.2d 523].)

The above cited rule is essential because the law cannot countenance two or more conflicting laws. Therefore, in the event of conflict between laws, the courts apply a variety of rules for determining which law prevails. For example, a specific provision will usually prevail over a more general provision of law. (*People v. Weatherill* (1989) 215 Cal.App.3d 1569, 1577-1578 [264 Cal.Rptr. 298].) In the event of irreconcilable conflict, a later enacted provision will usually control over an earlier enacted provision. (*County of Ventura v. Barry* (1927) 202 Cal. 550, 556 [262 P. 1081].) And it is fundamental that a constitutional provision prevails over an inconsistent statutory provision. With respect to matters of statewide concern, a statute will prevail over local laws. (*Fielder v. City of Los Angeles* (1993) 14 Cal.App.4th 137, 143 [17 Cal.Rptr.2d 630].) With respect to municipal affairs, the charter and ordinances of a charter city or county will prevail over statutory law. (*Ibid.*)

What all these rules have in common is the triggering event of two or more otherwise validly enacted laws that are in conflict. A court will not declare a validly enacted law to be invalid or void unless it is in irremediable conflict with another validly enacted law. (*Fuentes v. Workers' Comp. Appeals Bd.* (1976) 16 Cal.3d 1, 7 [128 Cal.Rptr. 673, 547 P.2d 449].) So it is with the rule for determining the effect of two measures adopted at the same election. To create a conflict that requires resolution, both measures must be approved. If one measure fails to win approval, it does not become effective for any purpose and no conflict is introduced into the law.

Our conclusion is supported, indeed dictated, by another provision of California's Constitution. At the June 2, 1998, Primary Election, the voters added article XI, section 7.5 to the Constitution by approving Proposition 219. Subdivision (a)(2) of that section prohibits the governing body of a local government, including a charter city, from submitting a measure to the voters that would "[c]ontain alternative or cumulative provisions wherein one or more of those provisions would become law depending upon the

casting of a specified percentage of votes for or against the measure."[2] (See also Cal. Const., art. II, § 8, subd. (f); *id.*, art. II, § 11, subd. (c); *id.*, art. IV, § 8.5, subd. (b).)

The analysis by the Legislative Analyst printed in the Ballot Pamphlet reveals that the impetus for the measure was, in part, the recent behavior of a local government that had placed a measure before the voters providing that it would impose a general tax if approved by a majority or a special tax if approved by two-thirds of the voters; thus, the analysis noted, "a 'yes' vote could mean two different things." The analysis of Proposition 219 went on to state that, if the proposition were approved, "a ballot measure could not have one outcome if approved by a majority of voters and a different outcome if approved by a two-thirds vote." (Voter Information Guide, Primary Elec. (June 2, 1998) analysis of Prop. 219 by the Legislative Analyst, p. 6.)

█ When Proposition 219 is read along with Proposition 218, the result is clear. When a local government asks the voters to approve a tax, it must decide whether to ask for a general tax or a special tax. If it asks for a general tax, only majority approval is required; but the local government must forgo any electoral advantage that might be gained from limiting the use of revenues to specific purposes.[3] If the local government asks the voters to approve a special tax, it might gain an electoral advantage; but a two-thirds vote is required for approval. Such a measure must be placed before the voters on an all-or-nothing basis. Accordingly, if a special tax fails to gain a two-thirds voter approval, it is not approved and the measure can be given no effect.

█ In Measure Q, the City asked the voters to approve a special tax. The measure did not gain a two-thirds voter approval and therefore was not

---

[2] In this respect, a measure includes "an advisory question, proposed charter or charter amendment, ordinance, proposition for the issuance of bonds, or other question or proposition submitted to the voters of a city . . . ." (Cal. Const., art. XI, § 7.5, subd. (b).)

[3] It seems obvious that a reason for restricting the use of tax revenues in Measure Q was to gain an advantage among voters. Since the utility user's tax would cover only a small portion of the funds used for the specified purposes, and because Measure Q did not preclude the City from shifting other general funds to other purposes, the passage of Measure Q would have made no real difference in City budgeting. But most people believe that police, fire, parks and recreation, and library services are among the most important local government services; and it is likely that many voters who favored repeal of the tax would also vote for Measure Q on the theory that, if the tax were not repealed, it would be a good idea to dedicate its revenues to those purposes. Under the circumstances, if Measure Q had not proposed a special tax, it may not have garnered a higher yes vote than Measure S. Applicable constitutional provisions were enacted to avoid this type of political maneuvering.

approved. It is ineffective for any purpose, including that of prevailing over Measure S, which was approved by the voters.

## DISPOSITION

The judgment is affirmed.

Davis, J., and Raye, J., concurred.