[No. F046860. Fifth Dist. Nov. 3, 2005.]

N. L. NEILSON, Plaintiff and Appellant, v.
CITY OF CALIFORNIA CITY, Defendant and Respondent.

1298

## COUNSEL

N. L. Neilson, in pro. per., for Plaintiff and Appellant.

Aaron L. Katz as Amicus Curiae on behalf of Plaintiff and Appellant.

Lemieux & O'Neill and W. Keith Lemieux for Defendant and Respondent.

Colantuono & Levin, Michael G. Colantuono and Amy C. Sparrow for the League of California Cities as Amicus Curiae on behalf of Defendant and Respondent.

Jennifer B. Henning for the California State Association of Counties as Amicus Curiae on behalf of Defendant and Respondent.

OPINION

DAWSON, J.—A nonresident landowner challenged a flat-rate parcel tax imposed by a city after the city's registered voters approved the tax by a two-thirds majority. The superior court sustained the city's general demurrer to the landowner's complaint, which alleged the parcel tax violated limitations on the taxation of real property contained in the California Constitution and violated the constitutional guarantee of equal protection.

The issues raised on appeal are (1) whether taxes based on the mere ownership of real property are constitutionally required to be ad valorem taxes; (2) whether the flat-rate parcel tax is a general tax and thus unconstitutional or, alternatively, is a special tax and therefore valid; (3) whether California law concerning voter eligibility requires that nonresident landowners affected by the tax be given the right to vote on the taxing measure; and (4) whether the equal protection clause prevents the city from using a residency requirement to determine who may vote on the tax when nonresident landowners are the largest source of revenue under the tax.

■ We hold that, as presently written, the California Constitution does not prohibit a tax on the mere ownership of real property if the tax is a special tax and not an ad valorem tax. In this case, the flat-rate parcel tax (1) was assessed on the mere ownership of real property, (2) was not an ad valorem tax, and (3) was a valid special tax because it was approved by two-thirds of the relevant electorate and its revenues were dedicated to specific governmental purposes. Furthermore, California law governing the qualification of voters establishes that the relevant electorate for the municipal election that approved the flat-rate parcel tax was the registered voters of the municipality. We also hold, under the rational basis test, that the equal protection clause does not require that nonresident landowners be given the right to vote on the taxing measure. Therefore, judgment is affirmed.

## FACTS AND PROCEEDINGS

In March 2004, the City Council of the City of California City (Council) passed Resolution No. 03-04-2099, which called a municipal election for June 8, 2004, and directed that voters be presented with a measure for a city-wide special tax of up to $75 per lot or parcel for each of the next three fiscal years. The municipal election was consolidated with other elections scheduled for that date.

At the June 2004 special election, the proposed parcel tax was presented to the voters of the City of California City (City) as Measure L. The impartial analysis of Measure L by the city attorney, which was set forth in the sample

ballot and voter information pamphlet, stated: "If this measure is approved by two-thirds of the voters, the City will be able to levy a special tax for three years commencing July 1, 2004. The maximum amount of tax the city can levy is $75 per lot or parcel per year. The City will use proceeds of the special tax to pay for police, fire and recreational services, and to repair streets, parks, water line replacement and repair, and building maintenance."

The argument in favor of Measure L was presented by the mayor, vice mayor, and Council members, and stated:

"Save Our Services! There is no city anywhere with a greater need to renew a special tax. We have over 50,000 privately-owned subdivided lots in the City, and approximately 3,800 registered voters. This means that every voter who votes for the special tax carries over 10 times the taxing power to benefit the City, because every one of those property owners supports the city with their special tax payments. While some absentee owners object to the tax, the vast majority of them understand that it holds up property values and therefore their investment.

"What we pay now for special tax is our personal investment in our city; public safety services, parks and recreation, street repair and maintenance, and this time, funding for emergency repairs of water main breaks that cost the city hundreds of thousands of dollars every year. The only practical way to pay for the infrastructure needs of our city is a special tax. Passage of Measure 'L' is a renewal of our previous $75.00 special tax for three years, not a new tax on top of old. [¶] . . . [¶]

"The most important reason for a California City special tax is that it is the only one we do not share with County, State or Federal agencies. Vote 'Yes' on Measure 'L'. Save Our Services."

Of the 4,011 registered voters in City, approximately 40.1 percent voted. Measure L passed by a vote of 1,128 (70.11 percent) to 481 (29.89 percent), which exceeded a two-thirds majority requirement.

On July 6, 2004, Council passed Resolution No. 07-04-2130 levying the special tax that the voters had approved. That resolution stated in part:

**"2. Special Tax Levy.**

"A special tax in the amount of $75.00 per lot or parcel is levied for the fiscal year commencing July 1, 2004. The City Clerk is authorized and directed to transmit a certified copy of this resolution to the Kern County Tax

Collector and the Kern County Auditor-Controller with a request for the tax to be levied and collect [*sic*] on the property tax rolls.

**"3. Special Tax Expenditures.**

"(a) The proceeds of the special tax levy shall be deposited into a special tax fund to be spent, as nearly as practicable, as follows:

| | | |
|---|---|---|
| "(1) | Fire Services | $ 800,000 |
| "(2) | Parks and Recreation | $ 320,000 |
| "(3) | Police Services | $ 800,000 |
| "(4) | Water Services | $ 480,000 |
| "(5) | Street Improvements | $ 800,000 |
| | "TOTAL | $3,200,000 |

"(b) On or before August 1, 2004, the City Council shall reconcile expenditures of special tax proceeds. Future expenditures within a category will be increased if the expenditure for the 2004–2005 fiscal year is less than the above amounts. Future expenditures within a category will be reduced if the expenditure for the 2004–2005 fiscal year exceeds the above amount. Unexpended (surplus) amounts shall be reserved for future expenditure within the category with the surplus. The annual reconciliation will be reported.

**"4. Compliance.**

"The City Council certifies this tax complies with California Constitution, Article XIII D."

Within three weeks of the passage of the foregoing resolution by Council, plaintiff filed a complaint for declaratory and injunctive relief to invalidate the $75 parcel tax. The complaint alleged, as relevant here, that (1) the tax violated section 1 of article XIII A of the California Constitution,[1] (2) the tax was not a "special tax" for purposes of section 4 of article XIII A, (3) the tax violated the equal protection clause by making absentee landowners subsidize local residents, and (4) the tax amounted to taxation without representation because the vast majority (85 percent) of those paying the tax were absentee landowners who could not vote on the tax.

City filed a demurrer, and the hearing was scheduled for September 30, 2004. Prior to the hearing, plaintiff submitted a first amended complaint, but the superior court did not receive a copy until the beginning of the hearing. The superior court sustained the demurrer to the original complaint, stated it would treat the first amended complaint as plaintiff's attempt to correct the

---

[1] All further references to articles are to the California Constitution.

failure to state a claim, set the matter for a further hearing on October 29, 2004, and told plaintiff that if he wanted to file further papers he should do so by October 22, 2004. Plaintiff filed a second amended complaint on October 8, 2004.

Shortly thereafter, City filed a supplemental demurrer to the first and second amended complaints based on the ground that the plaintiff failed to allege facts sufficient to demonstrate that the $75 parcel tax was unlawful. City argued that the flat-rate parcel tax was a special tax dedicated to specific purposes and, "as a legal matter, the fact that the tax [wa]s dedicated to multiple special purposes does not in any [way] diminish its character as a special tax."

In opposition to the supplemental demurrer, plaintiff argued, among other things, that there must be some limit on when a series of stacked "specific purposes" crosses the line into "general governmental services" and, thus, the tax involved is a "general tax" rather than a "special tax." Plaintiff further argued that the determination of when that line was crossed required a trial on the merits. Finally, at oral argument on the supplemental demurrer, plaintiff suggested that the trial court grant him summary judgment, and concluded: "everything we wanted in the record . . . is in there. . . . So everything we want to take up is in there."

The superior court sustained the demurrer without leave to amend and, on December 20, 2004, signed and filed a judgment in favor of City.

On appeal, the League of California Cities, joined by the California State Association of Counties, have filed an amici curiae brief in support of the position of respondent City, and Aaron L. Katz has filed an amicus curiae brief in support of plaintiff's position.[2]

## DISCUSSION

### I. Standard of review

██ An appellate court must independently decide questions of law without deference to the trial court's conclusions. (*Evans v. Unemployment Ins. Appeals Bd.* (1985) 39 Cal.3d 398, 407 [216 Cal.Rptr. 782, 703 P.2d

---

[2] Mr. Katz states he is the plaintiff in two actions filed in the County of Santa Clara that challenge voter approval of a special tax and a bond issue on the ground that he was not allowed to vote in those elections despite being a general partner in a partnership that owned real property subject to the tax. Presently, it appears the two actions have been combined and, because of a notice of appeal filed by Mr. Katz on June 29, 2005, are before the Sixth Appellate District. (*Katz v. El Camino Hospital District et al.* (H028994).)

122].) A demurrer tests only the sufficiency of the pleadings and, as such, raises only a question of law. (*Cellular Plus, Inc. v. Superior Court* (1993) 14 Cal.App.4th 1224, 1231 [18 Cal.Rptr.2d 308].) Also, a dispute over the meaning of a constitutional provision presents a question of law. (*Citizens for Hatton Canyon v. Dept. of Transportation* (2004) 112 Cal.App.4th 838, 843 [5 Cal.Rptr.3d 480].)

## A. *Demurrers*

■ In reviewing a demurrer that is sustained without leave to amend, an appellate court assumes the truth of (1) all facts properly pleaded by the plaintiff, (2) all facts contained in exhibits to the complaint, (3) all facts that are properly the subject of judicial notice, and (4) all facts that reasonably may be inferred from the foregoing facts. (See Code Civ. Proc., §§ 430.30, 430.70; Evid. Code, §§ 452, 459; *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58]; *Satten v. Webb* (2002) 99 Cal.App.4th 365, 375 [121 Cal.Rptr.2d 234] [exhibits]; *Rose v. Royal Ins. Co.* (1991) 2 Cal.App.4th 709, 716 [3 Cal.Rptr.2d 483] [inferences drawn from allegations].) The reviewing court does not assume the truth of contentions, deductions or conclusions of law. (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966–967 [9 Cal.Rptr.2d 92, 831 P.2d 317].)

The reviewing court must reverse the judgment if (1) the complaint, liberally construed, has stated a cause of action under any possible legal theory; or (2) the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment. (Code Civ. Proc., § 452 ["allegations must be liberally construed, with a view to substantial justice between the parties"]; *Blank v. Kirwan, supra*, 39 Cal.3d at p. 318.) The burden of proving a reasonable possibility of cure is squarely on the plaintiff. (*Blank,* at p. 318.)

## B. *Determining meaning of constitutional provisions*

■ "The principles of constitutional interpretation are similar to those governing statutory construction. In interpreting a constitution's provision, our paramount task is to ascertain the intent of those who enacted it. [Citation.] To determine that intent, we 'look first to the language of the constitutional text, giving the words their ordinary meaning.' [Citation.] If the language is clear, there is no need for construction. [Citation.] If the language is ambiguous, however, we consider extrinsic evidence of the enacting body's intent. [Citations.]" (*Thompson v. Department of Corrections* (2001) 25 Cal.4th 117, 122 [105 Cal.Rptr.2d 46, 18 P.3d 1198].)

The principle that clear language does not need construction, however, is subject to the exception that the literal language of a constitutional amendment may be disregarded to avoid absurd results and to give effect to the

apparent intent of the voters. (*Provigo Corp. v. Alcoholic Beverage Control Appeals Bd.* (1994) 7 Cal.4th 561, 567 [28 Cal.Rptr.2d 638, 869 P.2d 1163]; *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].)

## II. Background on Propositions 13, 62, and 218

The parties have cited various provisions of Propositions 13, 62, and 218, which one writer has characterized as parts of a "taxpayer revolt." (Comment, *Is Nothing Certain but Death? The Uncertainty Created by California's Proposition 218* (2001) 35 U.S.F. L.Rev. 385, 388 (Comment).) We begin with a brief overview of those propositions.

### A. Proposition 13

California's voters approved Proposition 13 in 1978, and its provisions, incorporated into article XIII A, (1) limit ad valorem property taxes to 1 percent of a property's assessed value, (2) limit increases in assessed value to 2 percent per year unless ownership of the property has changed, and (3) require two-thirds voter approval of any "special tax." (Art. XIII A, §§ 1, 2, subds. (a) & (b), 4.)

The constraints of Proposition 13 caused local governments to look to new means of generating revenue. One local government imposed a payroll and gross receipts tax and used the proceeds for general revenue purposes. (*City and County of San Francisco v. Farrell* (1982) 32 Cal.3d 47 [184 Cal.Rptr. 713, 648 P.2d 935].) The California Supreme Court held this type of tax was a "general tax" and not a "special tax" because the proceeds were placed in the general fund to be used for general governmental purposes. (*Id.* at p. 57.) Consequently, the tax was not subject to the two-thirds vote requirement section 4 of article XIII A imposed on special taxes.

### B. Proposition 62

In 1986, California voters approved Proposition 62, which added sections 53720 through 53730 to the Government Code. "The manifest purpose of Proposition 62 as a whole was to increase the control of the citizenry over local taxation by requiring voter approval of all new local taxes imposed by all local governmental entities: the measure defines broadly and inclusively both the taxes (§ 53721) and the entities (§ 53720) to which it applies." (*Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 235 [45 Cal.Rptr.2d 207, 902 P.2d 225].)

The voter approval requirements are set forth in Government Code sections 53722 and 53723. Section 53722 provides that a local government or

district may not impose "any *special tax* unless and until such special tax is submitted to the *electorate of the local government,* or district and approved by a *two-thirds vote* of the voters voting in an election on the issue." (Italics added.) Section 53723 provides that "[n]o local government, or district, whether or not authorized to levy a property tax, may impose any *general tax* unless and until such general tax is submitted to the *electorate of the local government,* or district and approved by a *majority vote* of the voters voting in an election on the issue." (Italics added.)

### C. *Proposition 218*

After Proposition 62, local government resorted to the use of fees and assessments, which did not require voter approval, to fill the void. The increase in assessments and fees imposed by local governments led California voters, in November 1996, to approve Proposition 218, which was designed to provide voters with control over taxes regardless of whether they were called assessments, fees, or charges. (Comment, *supra,* 35 U.S.F. L.Rev. at pp. 394–395.)

The Fourth Appellate District described the adoption of Proposition 218 as follows: "Proposition 218 allows only four types of local property taxes: (1) an ad valorem property tax; (2) a special tax; (3) an assessment; and (4) a fee or charge. ([A]rt. XIII D, § 3, subd. (a)(1)–(4); see also [*id.*], § 2, subd. (a).) It buttresses Proposition 13's limitations on ad valorem property taxes and special taxes by placing analogous restrictions on assessments, fees, and charges." (*Howard Jarvis Taxpayers Assn. v. City of Riverside* (1999) 73 Cal.App.4th 679, 682 [86 Cal.Rptr.2d 592].)

Sections 3 and 4 of Proposition 218 amended the California Constitution by adding article XIII C, which concerns voter approval of local tax levies, and article XIII D, which limits the ability of local governments to impose assessments, fees, and charges. For example, article XIII D prohibits fees or charges for "general governmental services." (Art. XIII D, § 6, subd. (b)(5).)

Proposition 218 is significant in this appeal because of its definitions and because, like Proposition 13, it includes a provision requiring that special taxes receive two-thirds approval. "No local government may impose, extend, or increase any special tax unless and until that tax is submitted to the electorate and approved by a two-thirds vote." (Art. XIII C, § 2, subd. (d).)

### III. *Non–ad valorem real property taxes are constitutional*

In his opening brief, plaintiff asks this court to settle a question of law concerning the meaning of a particular phrase in section 4 of article XIII A.

That section provides in full: "Cities, counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, *except ad valorem taxes on real property* or a transaction tax or sales tax on the sale of real property within such City, County or special district." (Art. XIII A, § 4, italics added.)

Plaintiff contends that (1) the California Constitution requires that taxes based on the mere ownership of real property must be ad valorem taxes, and (2) section 4 of article XIII A cannot be read to mean local governments are granted the authority to adopt non–ad valorem taxes, whether general or special, on the mere ownership of real property.[3]

Another constitutional provision relevant to plaintiff's argument, however, is the limitation on property taxes, assessments, fees and charges set forth in Proposition 218:

"(a) No tax, assessment, fee, or charge shall be assessed by any agency upon any parcel of property or upon any person as an incident of property ownership except:

"(1) The ad valorem property tax imposed pursuant to Article XIII and Article XIII A.

"(2) Any special tax receiving a two-thirds vote pursuant to Section 4 of Article XIII A.

"(3) Assessments as provided by this article.

"(4) Fees or charges for property related services as provided by this article." (Art. XIII D, § 3.)

█ The use of the phrase "[a]ny special tax" and the language in article XIII D, section 3, subdivision (a) that introduces the enumerated exceptions clearly establish that a special tax receiving a two-thirds vote may be imposed "upon any parcel of property or upon any person as an incident of property ownership." Therefore, to harmonize the constitutional provisions we must reject plaintiff's interpretation of section 4 of article XIII A. Instead, we conclude that a non–ad valorem tax may be imposed upon real property if the tax is a "special" tax dedicated to specific purposes and approved "by a two-thirds vote of the qualified electors of" the city, county, or special district imposing the tax. (Art. XIII A, § 4.)

---

[3] At oral argument, plaintiff contrasted taxes based on mere ownership with taxes based on other grounds, such as the use to which the real property is put.

IV. *Plaintiff's allegations, accepted as true, fail to demonstrate that the flat-rate parcel tax is not a valid "special tax"*

City does not dispute that a flat-rate parcel tax is unconstitutional if it is a general tax. (See *City of Oakland v. Digre* (1988) 205 Cal.App.3d 99 [252 Cal.Rptr. 99] [general flat-fee parcel tax was invalid under art. XIII, § 1]; *Thomas v. City of East Palo Alto* (1997) 53 Cal.App.4th 1084 [62 Cal.Rptr.2d 185] [general flat-fee parcel tax was a property tax and not an excise tax; question whether it was a "special tax" not reached because two-thirds voter approval not obtained].) City contends, however, that the superior court correctly sustained the demurrer because the record conclusively establishes that its $75 flat-rate parcel tax is not a general, but a special tax.

A. *Definitions of general tax and special tax*

■ Pursuant to article XIII C, section 1, subdivisions (a) and (d), added by Proposition 218 in 1996, the term "general tax" means "any tax imposed for general governmental purposes," and a "special tax" is "any tax imposed for specific purposes, including a tax imposed for specific purposes, which is placed into a general fund." To prevent the creation of a new category of local taxes, Proposition 218 also provided that "[a]ll taxes imposed by any local government shall be deemed to be either general taxes or special taxes." (Art. XIII C, § 2, subd. (a).) Accordingly, the two types of taxes are distinguished by the purposes for which they were imposed, not the activity or rights on which they are imposed.[4]

■ In *Howard Jarvis Taxpayers Assn. v. City of Roseville* (2003) 106 Cal.App.4th 1178 [132 Cal.Rptr.2d 1], the appellate court addressed the dividing line between general and special taxes created by the use of the term "specific purposes" in the definition of the latter: "Pursuant to these definitions, a tax is special whenever expenditure of its revenues is limited to specific purposes; this is true even though there may be multiple specific purposes for which revenues may be spent. [Citation.] A tax is general only when its revenues are placed into the general fund and are available for expenditure for any and all governmental purposes. [Citation.]" (*Id.* at p. 1185.)

The *Roseville* court then determined that a utility user's tax, which generated revenues solely for police, fire, parks and recreation, and library

---

[4] Heading A.6 of plaintiff's reply brief refers to *special* purposes rather than "specific purposes," which is the term used in the constitutional definition of special taxes and in Government Code section 53721. Plaintiff may have picked up the term "special purpose" from this court's opinion in *County of Fresno v. Malmstrom* (1979) 94 Cal.App.3d 974, 983 [156 Cal.Rptr. 777], where we stated that a " 'special tax' is a tax collected and earmarked for a special purpose[.]" That definition of "special tax," however, was superseded by the subsequent enactment of Propositions 62 and 218.

services, was a "special tax" because it was imposed for specific purposes. (*Howard Jarvis Taxpayers Assn. v. City of Roseville, supra,* 106 Cal.App.4th at pp. 1183, 1186.) This was true even though those purposes accounted for approximately 50 percent of the city's general fund expenditures. (*Id.* at p. 1187.) Because the utility user's tax had received only a majority approval and not two-thirds voter approval, the court held it was invalid. (*Id.* at p. 1189.) In reaching its holding, the court emphasized its view that the city had gained an advantage with the voters by announcing the revenues generated would be limited to specific purposes. (*Ibid.*)

### B. *Plaintiff's allegation that the parcel tax is a sham*

Plaintiff alleged and continues to argue that the parcel tax is a sham, designed to avoid Proposition 13's limit on ad valorem property taxes. He approaches this assertion in two ways.

 First, plaintiff argues that the parcel tax is a general tax because the purposes for which its levies can be spent—public safety services, parks and recreation, street repair and maintenance, and water services—are, by their nature, "general governmental purposes" for City. This construction of "general" is not convincing because it does not fit well with the dividing line created by the constitutional definitions, which looks to the question whether the purposes for which the tax can be used have been specified or not. The specification of purposes is important because it is the means for providing voters with control over the use of tax revenues. (*Howard Jarvis Taxpayers Assn. v. City of Roseville, supra,* 106 Cal.App.4th at p. 1189.) When purposes are not specified, then the local government has the discretion to determine how the funds will be spent. In addition to the obstacles raised by the constitutional definitions, plaintiff has not adequately distinguished the list of purposes for which City's flat-rate parcel tax could be used from the list of purposes for the special tax in *Roseville.* (*Id.* at p. 1187.) Consequently, case law supports the proposition that police, fire, and parks and recreation services can be "specific purposes" when specified to voters, and they are not necessarily "general governmental purposes." (Art. XIII C, § 1, subds. (a) & (d).) Plaintiff has cited no authority that contradicts the holding in *Roseville* or supports his view that certain governmental expenditures, like salaries for local police, are by their nature for "general governmental purposes." Plaintiff may have confused "general governmental purposes" with "general governmental services," which is a term used in article XIII D, section 6, subdivision (b)(5). That provision applies not to taxes, either general or special, but instead to fees or charges. Plaintiff does not assert that the parcel tax is a fee or charge.[5]

---

[5] Amicus curiae Katz does contend the parcel tax is an invalid assessment. The apparent basis for this contention is Katz's assertion that City admitted the tax was an assessment by

Second, in opposing the demurrer, plaintiff supported his contention that the parcel tax is a sham special tax, and really a general tax, by arguing that there must be some limit on the specific purposes that can be stacked together before the line is crossed and the revenues are used for "general governmental services." Again, however, plaintiff fails to provide supporting authority. Further, plaintiff ignores the opinion in *Roseville*, a case in which the designated purposes of the special tax were so numerous as to account for some 50 percent of the city's general fund budget. (*Howard Jarvis Taxpayers Assn. v. City of Roseville, supra,* 106 Cal.App.4th at p. 1187.) Finally, we note that the use of the plural "specific purposes" in the definition of "special tax" shows that the enactors contemplated that a special tax could be used for more than one purpose without losing its status as a special tax. (See generally *Silvio v. Ford Motor Co.* (2003) 109 Cal.App.4th 1205, 1208–1209 [135 Cal.Rptr.2d 846] [use of plural in statutory requirement].)

Plaintiff does not suggest a means for determining at what point a special tax becomes a general tax because of the number of purposes for which its revenues may be used. Though we can conceive of a special tax that permits expenditures for so many specific governmental purposes that the parts might swallow the whole, plaintiff has not pled sufficient facts to show that the parcel tax here is such a tax. Neither does plaintiff suggest how he might cure this defect were he allowed yet another chance to plead.

---

noting in two postelection resolutions that the tax "complie[d] with the applicable provisions of Article XIII D." In another argument made neither here nor below by plaintiff, Katz contends the parcel tax is invalid because neither the resolution by which Council sent the proposed tax to the voters nor Measure L itself contained explicit accountability measures required by Government Code sections 50075.1 and 53724.

Amicus curiae must take the case as he or she finds it. (*California Assn. for Safety Education v. Brown* (1994) 30 Cal.App.4th 1264, 1274–1275 [36 Cal.Rptr.2d 404].) " ' "[A]n appellate court will consider only those questions properly raised by the appealing parties . . . , and any additional questions presented in a brief filed by an amicus curiae will not be considered [citations]." ' [Citation.]" (*Younger v. State of California* (1982) 137 Cal.App.3d 806, 813–814 [187 Cal.Rptr. 310].) While this rule is not absolute, and an appellate court has discretion to consider new issues raised by an amicus curiae that concern only matters of law and involve important issues of policy (*Lavie v. Procter & Gamble Co.* (2003) 105 Cal.App.4th 496, 503 [129 Cal.Rptr.2d 486]), we decline to do so here because both of the suggested new issues have factual aspects. First, it is plaintiff's burden to show a reasonable probability that he can include the necessary factual allegations to support these new theories, and plaintiff has not carried that burden. For instance, Measure L is not itself part of the appellate record and, thus, we cannot assess the probability that he can adequately allege the accountability provisions of the Government Code were violated. Second, both plaintiff and amicus curiae Katz have asked that this court not remand the case for additional pleadings because the third year of the flat-rate parcel tax would have been assessed before the trial court would have ruled on any amended pleadings. In short, the factual aspects of the new theories would lead to a lapse of time that plaintiff wishes to avoid.

Plaintiff's mere unsupported assertion that this tax is a sham—not a special but a general tax—is not sufficient to overcome City's demurrer (*Aubry v. Tri-City Hospital Dist.*, *supra*, 2 Cal.4th at pp. 966–967), and he suggests no way in which he could improve his pleading. We therefore need not decide whether a local electorate may, by a two-thirds majority, approve as a special tax that which, in effect, allows expenditures beyond those provided for by ad valorem property taxes for all or virtually all governmental purposes. It is enough here to note that plaintiff has failed to plead sufficient facts to show that City's parcel tax is not a valid special tax and has failed to show a reasonable possibility that the pleading deficiency can be cured by amendment. (See *Blank v. Kirwan*, *supra*, 39 Cal.3d at p. 318.)

## V. Who are the "qualified electors"?

Section 4 of article XIII A states: "Cities, counties and special districts, by a two-thirds vote of *the qualified electors of such district*, may impose special taxes on such district . . . ." (Italics added.)

Plaintiff contends that the affected property owners, not the registered voters of City, were the "qualified electors" for purposes of section 4 of article XIII A. By submitting the flat-rate parcel tax to City's registered voters, plaintiff claims, City disenfranchised 90 percent of the property owners.

After article XIII A was added to the California Constitution by the adoption of Proposition 13, the idea that a special tax must obtain two-thirds approval also was addressed in Propositions 62 and 218.

Proposition 62 enacted Government Code section 53722, which provides: "No local government or district may impose any special tax unless and until such special tax is submitted to *the electorate of the local government*, or district and approved by a two-thirds vote of the *voters voting in an election on the issue*." (Italics added.)

Similarly, Proposition 218 provides that "[n]o local government may impose, extend, or increase any special tax unless and until that tax is submitted to *the electorate* and approved by a two-thirds vote." (Art. XIII C, § 2, subd. (d), italics added.)

City contends that section 4 of article XIII A should be harmonized with section 2 of article XIII C and that various definitions in place at the time

Proposition 218 was adopted lead to the conclusion that City's resident voters are the relevant electorate.[6]

■ The Elections Code defines "elector" to mean "any person who is a United States citizen 18 years of age or older and a resident of an election precinct at least 15 days prior to an election." (Elec. Code, § 321.) The Elections Code does not contain a formal definition of the word "qualified," but it does contain variations of that word that are useful in determining its meaning. For example, division 2 of the Elections Code is titled "Voters" and it contains chapters titled "Voter Qualifications" (ch. 1, beginning with § 2000) and "Registration" (ch. 2, beginning with § 2100). Pursuant to section 2000 of the Elections Code, "[e]very person who *qualifies* under Section 2 of Article II of the California Constitution and who complies with this code governing the registration of electors may vote at any election held within the territory within which he or she resides and the election is held." (Italics added.) Article II, section 2 provides that a "United States citizen 18 years of age and resident in this state may vote." ■ Also, Elections Code section 359 provides that "voter" means "any elector who is registered under this code."

■ Based on the foregoing provisions, we conclude the phrase "qualified electors of such district" (art. XIII A, § 4) means the registered voters of City who voted in the election. First, the prepositional phrase "of such district" means City because the tax is imposed by City on all parcels within its geographical limits. Second, the term "qualified electors" means registered voters. Third, "two-thirds vote" means two-thirds or more of the votes cast in the election at issue. Thus, by combining these terms, section 4 of article XIII A required the special tax to be approved by two-thirds of City's registered voters who voted in the election concerning Measure L.

■ We reject plaintiff's different construction because the voting eligibility requirements that he proposes are set forth in article XIII D in regards to special assessments. We apply a fundamental rule of construction: " 'Where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different intention existed.' " (*City of Port Hueneme v. City of Oxnard* (1959) 52 Cal.2d 385, 395 [341 P.2d 318]; see

---

[6] The only statutory definition we have located of "qualified elector" is in the Public Utilities Code. " 'Elector,' 'voter,' or 'qualified elector,' means a voter whose name appears on the great register of the county in which the district is located, or any supplement thereto, allowed by law to be used to determine the eligibility of persons to vote at municipal or county elections, and whose address as it appears on the great register or supplement is in the same unincorporated territory as the address given by him on the certificate or petition that is signed by him." (Pub. Util. Code, § 15505.)

also *Thompson v. Department of Corrections*, *supra*, 25 Cal.4th at p. 122 [principles of constitutional interpretation are similar to those of statutory construction].)

## VI. *Equal protection*

Plaintiff argues the scheme by which voter approval was obtained for Measure L violated equal protection because City did not enfranchise nonresident property owners with the right to vote on the measure.

■ Our analysis of such a discrimination claim starts with the basic principle of "one person, one vote" that the United States Supreme Court has derived from the equal protection clause of the Fourteenth Amendment of the federal Constitution.[7] (*Reynolds v. Sims* (1964) 377 U.S. 533 [12 L.Ed.2d 506, 84 S.Ct. 1362] [legislative apportionment system that gave districts with 25 percent of population a majority of representatives in both houses violated equal protection requirement that votes be given equal weight].) The "one person, one vote" doctrine addresses (1) the dilution of one's vote in comparison to the vote of another and (2) the denial of a person's right to vote through eligibility criteria that selectively distribute the franchise. (See Cole, *Special Assessment Law Under California's Proposition 218 and the One-Person, One-Vote Challenge* (1998) 29 McGeorge L.Rev. 845, 872.) Plaintiff's claim involves the latter category.

■ A very useful introduction and summary of the law regarding equal protection and the right to vote was published by Division Four of the First Appellate District in *Hoffman v. State Bar of California* (2003) 113 Cal.App.4th 630 [6 Cal.Rptr.3d 592]. That discussion will not be repeated here except for its description of restricting the right to vote to residents, which is at the heart of plaintiff's equal protection challenge: "(d) *Residency Restrictions*: Bona fide residency is another acceptable restriction on the franchise. Simply put, states may require voters to be bona fide residents of the relevant political subdivision. [Citations.] As one commentator has explained: '[I]n deciding who may and who may not vote in its elections, a community takes a crucial step in defining its identity.' (Tribe, American Constitutional Law (2d ed. 1988) Rights of Political Participation, § 13-10, p. 1084.) '[T]he rule that a state or municipality may restrict the franchise to its bona fide residents . . . recognizes that nonresidents may be affected by and interested in what a state or municipality does, but nonetheless accepts *territory* as the best available means of drawing a boundary for purposes of

---

[7] "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." (U.S. Const., amend. XIV, § 1.) Similarly, article I, section 7, subdivision (a) of the California Constitution states in part: "A person may not be . . . denied equal protection of the laws . . . ."

the franchise.' (*Id.*, § 13-12, pp. 1088–1089, fn. omitted.)" (*Hoffman v. State Bar of California*, *supra*, at pp. 644–645.)

The United States Supreme Court has considered an equal protection claim brought against a city by nonresidents who were not allowed to vote in its elections. (*Holt Civic Club v. City of Tuscaloosa* (1978) 439 U.S. 60 [58 L.Ed.2d 292, 99 S.Ct. 383] (*Holt*).) People residing in Holt, a small, unincorporated community on the outskirts of the City of Tuscaloosa, challenged an Alabama statute that subjected Holt residents to the city's police and sanitation regulations, to the criminal jurisdiction of the city's courts, and to the city's power to license businesses, trades, and professions, but did not give them the right to participate in the political processes of the city by voting in its elections. (*Id.* at pp. 61–63.) The United States Supreme Court denied the equal protection challenge and stated: "From [our earlier] voting qualifications cases a common characteristic emerges: The challenged statute in each case denied the franchise to individuals who were physically resident within the geographic boundaries of the governmental entity concerned. [Citations.] No decision of this Court has extended the 'one man, one vote' principle to individuals residing beyond the geographic confines of the governmental entity concerned, be it the State or its political subdivisions. On the contrary, our cases have uniformly recognized that a government unit may legitimately restrict the right to participate in its political processes to those who reside within its borders. [Citations.]" (*Holt*, *supra*, at pp. 68–69.)

Plaintiff and amicus curiae Katz contend that City must show a compelling state interest to justify its failure to include nonresident landowners among the voters allowed to vote on Measure L. (See *Curtis v. Board of Supervisors* (1972) 7 Cal.3d 942, 963 [104 Cal.Rptr. 297, 501 P.2d 537] [statute that allowed nonresident landowners to prevent residents from voting on proposed incorporation of area into a city struck down because it lacked a compelling state interest].) Among other things, they contend this level of strict scrutiny is required because the measure primarily affected nonresident landowners.

■ Based on existing case law, we reject the strict scrutiny test in favor of applying the rational basis test to the facts pled in this case. Strict scrutiny is used to protect the right to vote of those who are *otherwise qualified to vote*. Someone otherwise qualified to vote could be characterized as having a "fundamental" interest in the right to vote, which may not be infringed absent a compelling state interest. But strict scrutiny is not used to create a right to vote in nonresidents who are not otherwise qualified.

For instance, in *Kramer v. Union Free School Dist.* (1969) 395 U.S. 621, 627 [23 L.Ed.2d 583, 89 S.Ct. 1886], the United States Supreme Court stated

that "if a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest."

Similarly, a Louisiana law that stated only property taxpayers could vote in elections to approve the issuance of revenue bonds by a municipal utility system was declared unconstitutional. (*Cipriano v. City of Houma* (1969) 395 U.S. 701 [23 L.Ed.2d 647, 89 S.Ct. 1897].) The United States Supreme Court held that the exclusion of otherwise qualified voters who were substantially affected and directly interested in the election issue must be reviewed under strict scrutiny.

In *City of Phoenix v. Kolodziejski* (1970) 399 U.S. 204 [26 L.Ed.2d 523, 90 S.Ct. 1990], the United States Supreme Court ruled that restricting the franchise to real property taxpayers in a general obligation bond issue was unconstitutional because the interests of property owners and nonproperty owners in a general obligation bond issue were not sufficiently disparate to justify excluding those owning no real property. Regardless of real property ownership, all residents of the city (1) had a common interest in the facilities that the bond issue would make available and (2) would be substantially affected by the outcome of the election in terms of the benefits provided and the obligations incurred. (*Id.* at pp. 209–210.)

 From these three United State Supreme Court cases, the following basic principle can be derived: "[A]s long as the election in question is not one of special interest, any classification restricting the franchise on grounds other than residence, age, and citizenship cannot stand unless the district or State can demonstrate that the classification serves a compelling state interest. [Citations.]" (*Hill v. Stone* (1975) 421 U.S. 289, 297 [44 L.Ed.2d 172, 95 S.Ct. 1637].)

In this case, the election is not one of special interest in that Measure L involved the taxing of all parcels within the boundaries of City, and the expenditure of those funds provides benefits that are not limited to special interests. Consequently, we conclude the rational basis test should apply.

 Prior to applying the rational basis test in this case, we observe that cases exist that say a local entity *may* base the right to vote on land ownership in certain situations without violating equal protection. But that is very different from holding that equal protection *requires* that persons owning land within the entity's boundaries be given the right to vote. (See *Salyer Land Co. v. Tulare Water District* (1973) 410 U.S. 719 [35 L.Ed.2d 659, 93 S.Ct. 1224] [property-based voting scheme for the election of the board of

directors of a California water storage district upheld]; *Bjornestad v. Hulse* (1991) 229 Cal.App.3d 1568, 1589–1592 [281 Cal.Rptr. 548] [discussing cases that applied rational basis test to uphold voting scheme that includes both residents and nonresidents against claim that vote of residents was unconstitutionally diluted].) We are unaware of any case holding that equal protection of the laws *requires* a government entity to extend the right to vote to nonresidents who own property within the geographic boundaries of that entity. Such a requirement would be contrary to our Supreme Court's statement that "residents have a constitutional right to vote in municipal elections [citation]; the nonresident landowners have no such right [citation]." (*Curtis v. Board of Supervisors, supra,* 7 Cal.3d at pp. 962–963.)

The closest analogy to plaintiff's situation of which we are aware occurred in *Massad v. City of New London* (1993) 43 Conn.Supp. 297 [652 A.2d 531]. In that case, city voters were presented with a referendum for the approval of a budget and tax rate ordinance. Nonresidents who owned taxable property within the city challenged the requirement that voters be residents of the city. Relying on *Holt, supra,* 439 U.S. 60, the court determined a rational basis existed for excluding nonresidents from voting in city elections because local residents have a greater knowledge and interest in local affairs, while nonresident property owners would mainly be interested in lower taxes. (*Massad v. City of New London, supra,* at p. 311 [652 A.2d at p. 538].) The court also stated: "New London's determination that persons who want to vote on city matters must also reside within its boundaries is a reasonable exercise of its discretion and within the power granted to it to run its own affairs, which is tailored to legitimate governmental concerns and is not overridden by the interests of persons owning taxable property in the town who prefer to live elsewhere." (*Id.* at pp. 312–313 [652 A.2d at p. 539].)

Accordingly, the court concluded that the residency requirement did not violate the Fourteenth Amendment to the United States Constitution or the equal protection provision of the Connecticut Constitution. (*Massad v. City of New London, supra,* 43 Conn.Supp. at p. 313 [652 A.2d at p. 539].)

As in *Massad,* we conclude that restricting the vote on Measure L to the residents of City was rationally based. City could have determined that the residents are most knowledgeable and interested in all aspects of local affairs, on both the revenue and expenditure side of its ledger. Consequently, the residency requirement that limited who could vote on Measure L did not violate the equal protection clause of the United States Constitution. Similarly, the equal protection clause in article I, section 7 of the California Constitution was not violated. (See *Hoffman v. State Bar of California, supra,* 113 Cal.App.4th at p. 641.)

## DISPOSITION

The judgment is affirmed.

Harris, Acting P. J., and Levy, J., concurred.

A petition for a rehearing was denied November 28, 2005, and appellant's petition for review by the Supreme Court was denied February 22, 2006, S139585.